(Nos. 104685, 105575 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. LERATIO SMITH, Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ADAM TITUS, Appellee.

*Opinion filed April 2, 2009.*

4

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (James Fitzgerald, Annette Collins, Veronica Calderon Malavia, Whitney Bond and Alan J. Spellberg, Assistant State's Attorneys, of counsel), for the People.

Patricia Unsinn, Deputy Defender, and Christopher W. Buckley, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, and Brianne Lannon, law student, for appellee.

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (James Fitzgerald, Annette Collins, Alan J. Spellberg and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People.

Patricia Unsinn, Deputy Defender, and Katherine M. Donahoe, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

In the consolidated cases on appeal, we are asked to

decide whether a trial court must provide the jury with separate verdict forms when a defendant who is charged with multiple counts of murder based on the various mental states (knowing, intentional, and felony murder) asks for separate verdict forms.

In the cases at bar, defendants were each charged with intentional murder, knowing murder, and felony murder, as well as the felony offenses underlying the felony-murder charges lodged against them. At their trials, both defendants requested separate verdict forms for felony murder and the trial courts denied the requests. In both cases, general verdicts of guilty of first degree murder were returned and defendants also were found guilty of the underlying felony offenses charged. At sentencing, the trial courts sentenced defendants on their murder convictions and, in addition, imposed consecutive terms for the underlying felonies.

Both defendants appealed, arguing that they were entitled to new trials because the trial courts had refused their requests for separate verdict forms for felony murder. The fourth division of the First District of the Appellate Court heard both appeals and affirmed the defendants' convictions. However, the court modified the defendants' sentences, holding that the trial courts had erred by refusing the requests for separate verdict forms. See *Smith*, 372 Ill. App. 3d 762 (eight-year consecutive sentence for attempted armed robbery modified to eight-year concurrent sentence); *Titus*, No. 1—05—1523 (unpublished order under Supreme Court Rule 23) (18-year consecutive sentence for armed robbery modified to 18-year concurrent sentence).

The State petitioned this court for leave to appeal in both cases. 210 Ill. 2d R. 315. We granted the petitions and consolidated the cases for our review.

## BACKGROUND
### Leratio Smith, No. 104685

On December 4, 1998, Tony Colon was a patron at Pete's Sidelines Bar in Chicago. Just before midnight, Colon stepped outside the front door of the bar to make a call on his cell phone. As Colon stood outside talking on the phone, a man grabbed him from behind and then forced him back into the bar while pointing a gun to his neck. The man with the gun was later identified as defendant Leratio Smith.

What happened after Smith entered the bar was revealed at Smith's trial through the testimony of three persons who had also been at the bar that night, as well as a security videotape. According to these witnesses, after Smith entered the bar holding Colon in a "head lock" and carrying a gun, Smith demanded that everyone in the bar get down on the floor. He then told the bartender to open the cash register and put the money on the bar. As the bartender was complying with Smith's orders, Smith grabbed for Colon's cell phone and a struggle ensued. The cell phone fell to the floor. Colon then confronted Smith, saying that he did not think Smith's gun was real, that it was only a BB gun. Smith responded, saying "I'll show you that the gun is real." Smith then pulled the slide back on the gun and shot Colon in the chest, killing him. After shooting Colon, Smith grabbed the money off the bar, ran outside, and got into a car that was waiting for him.

Pete's Sidelines Bar was equipped with security cameras and a video-recorder, which captured the entire incident on videotape. After witnesses testified that the videotape accurately depicted what had occurred inside the bar on December 4, 1998, the videotape was admitted into evidence and viewed by the jury. The jury, therefore, was able to observe the events that occurred inside the bar that night, which witnesses had already described through their testimony.

Off-duty police officer Scott Hahn also testified at Smith's trial. Hahn explained that he had been approaching Pete's Sidelines Bar around midnight on December 4, 1998, when he heard what sounded like a gunshot. He then saw a man, whom he identified as Smith, run out of the bar and get into a car. Hahn testified that he ran back to his own car and followed Smith's vehicle. During this time he was able to obtain the license plate number from Smith's car. After following Smith's car for about 20 minutes, Hahn lost sight of the vehicle. Hahn then returned to the bar, where he spoke with police officers who were investigating the shooting. Hahn provided the officers with the license plate number from Smith's vehicle.

Other trial evidence established that, on December 5, 1998, Smith was at his girlfriend's apartment when he learned that his license plate number was being broadcast on television and that the police were looking for him. Smith removed the license plates from his car and then contacted the police to report that the license plates on his vehicle had been stolen. Police officers went to Smith's location (which they obtained from Smith when he made the report) and placed him under arrest.

While in custody, Smith participated in lineups and was identified by several witnesses. Detective Benigno informed Smith that he had been identified and, after advising Smith of his rights, obtained a statement from him. Later, Smith repeated the statement to Assistant State's Attorney Nazarian. In this statement, which was memorialized by a court reporter, Smith admitted that, on the previous night, he had driven with a friend to the north side of Chicago with the intention of finding someone to rob. He came across a bar where he saw someone standing outside talking on a cell phone. Smith admitted that, while his friend waited in the car, he forced the man on the cell phone into the bar at gunpoint

and then, inside the bar, told the bartender and patrons to put their money on the bar.

Smith further stated that the man he forced back into the bar continued to talk on the cell phone and, for this reason, Smith tried to snatch the phone away from him. The man resisted, however, and the phone fell to the floor. Smith said the man then tried to tackle him, saying that Smith's gun was not real. Smith admitted that he became angry that the man pushed him. He said he pulled the slide back on the gun and pointed it at the bartender, but when the man "charged" at him, Smith turned the gun on the man and shot him in the chest. Smith said he then left the bar and fled in his car.

Smith also told police where he had hidden the gun he used in the shooting. Following Smith's instructions, the police recovered a gun from Smith's girlfriend's apartment. Testing later proved the gun to be the murder weapon.

At trial, Smith testified in his own behalf and denied that he shot Colon. Smith claimed that the friend he was with that night, codefendant Taylor, had been the one to enter the bar, rob it, and shoot the victim. Smith claimed that he was unaware that his friend had a gun or that he intended to rob the bar. He also claimed that the statement he had made after his arrest had been coerced and was not true. To refute Smith's claim that he had no intent to rob the bar, the State presented, in rebuttal, a certified copy of Smith's conviction for armed robbery, which he and codefendant Taylor committed on November 29, 1998, only a mile from where this robbery took place.

At the close of trial, two jury instruction conferences were held. At the first instruction conference, defense counsel asked that separate verdict forms be provided for the two counts of felony murder that had been charged. Initially, the State did not object and the trial judge agreed to give separate forms, stating:

"A defendant is charged with first degree murder based

upon armed robbery, first degree murder based upon attempt armed robbery, and first degree murder based upon knowing and intentional, so if you want different verdict forms, you will get all of them, unless the State is *nolle*-ing some of the charges. We are not going to separate out some of them and have confusion for the jury."

At the second jury instruction conference, defense counsel again asked for separate verdict forms, noting that a conviction for first degree murder based upon the commission of a felony would have implications for sentencing. This time the State objected, stating that using separate forms would set a "bad precedent" and could potentially lead to inconsistent verdicts. After hearing the State's argument, the trial court denied the defendant's request for separate forms.

Using a general verdict form for first degree murder, the jury found Smith guilty of that offense. The jury also found Smith guilty of armed robbery and attempted armed robbery. In a posttrial motion, defense counsel argued that the trial court erred in refusing to give separate verdict forms on felony murder. That motion was denied. In denying the motion, the trial court noted that the videotape had shown that Smith taunted the victim prior to shooting him and that the victim had not charged at the defendant, as he had claimed. The court held there was "absolutely no doubt that defendant intentionally killed" the victim. The court then imposed a sentence of 60 years for first degree murder, a *concurrent* term of 20 years for armed robbery, and a *consecutive* term of 8 years for attempted armed robbery.

On appeal, the fourth division of the First District of the Appellate Court noted that, had the jury found defendant guilty of felony murder premised on attempted armed robbery and not guilty of both intentional and knowing murder, defendant would not have been eligible to be sentenced to a consecutive sentence on the attempted armed robbery conviction. *Smith,* 372 Ill. App. 3d at 771. The court then held:

"[W]hen a defendant who is charged with intentional or knowing murder and felony murder requests a separate verdict form for felony murder and such a request has a basis in the evidence presented at trial, the separate verdict form must be given or consecutive sentences cannot be imposed based on the offense underlying the felony murder, pursuant to section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 2004))." *Smith*, 372 Ill. App. 3d at 771-72.

The court then affirmed defendant's convictions, but modified his eight-year sentence for attempted armed robbery to run concurrently with his other sentences.

People v. Titus, No. 105575

Defendant Adam Titus was charged with three counts of murder (intentional murder, knowing murder, and felony murder) and one count of armed robbery in connection with the robbery and shooting death of Charles Gordon, a pizza deliveryman. At Titus' trial, Nakeshia Banks testified that on January 12, 2002, she was 15 years old and lived in an apartment on West 154th Street in Harvey, Illinois. Around 5:30 p.m. that day, Titus came to her apartment with another person, who was later identified as codefendant Demetrius Phipps. Banks testified that Titus told her to call Arnie's Pizza and use a false name to order a pizza to be delivered to the vacant apartment next door. Banks said she made the call as requested and Titus and Phipps then left the apartment.

Banks further testified that, about 10 minutes after calling Arnie's, she left her apartment to go to the store with her sister. She saw the pizza deliveryman arrive and heard him ask if someone had ordered a pizza. Banks said she told the man, "Adam will be back to pay for it." Banks said that, as she continued toward the store, she looked back and saw the pizza deliveryman walk up the exterior staircase of her building and knock on an apartment door. When the deliveryman got no response at the door, he started to leave.

Banks testified that as the pizza deliveryman started to descend the stairs, she saw Titus and Phipps come from around the side of the building. Titus started up the same exterior staircase, while Phipps stayed at the bottom of the stairs. Banks said she watched Titus pass the delivery man on the stairs and then turn and hit the man on the back of the head "with something." Banks said the deliveryman fell down the stairs to the cement slab below, where Phipps began to beat him. Titus, using an object in his hand, joined in beating the man at the bottom of the stairs. Banks said she heard the man plead for them to stop and she, too, screamed at Titus to stop, but he paid no attention. Banks testified that she became frightened so she turned and ran toward her sister. As she was running away, she heard a gunshot. Banks testified that, initially, she did not tell police what she had seen because she had been threatened by two individuals who were Titus' friends.

Detective Eric Keyes of the Harvey police department also testified at Titus' trial. He told the jury that, on January 12, 2002, at about 5:48 p.m., he received a "flash message" that there had been a robbery and shooting at 198 West 154th Street involving two black men. Because Keyes and his partner, Detective Williams, were in the area, they responded within minutes of receiving the message. They saw three black men who matched the description given in the flash message, huddled together. The detectives exited their unmarked car and approached the men to investigate. When they announced their office, one of the men (who was later identified as Titus) pulled a gun from his waistband and began to run from the scene. The two detectives split up and pursued Titus along different courses. During the chase, Keyes saw Titus discard a gun in front of a residence. Soon thereafter, Detective Williams came around the corner and cut off Titus' escape. Titus then gave himself up.

After Titus' arrest, the gun was recovered from the spot where Keyes had seen Titus throw it. The gun was later subjected to ballistics testing, which revealed that the bullet that killed Gordon (the pizza deliveryman) had been fired from this gun.

At the police station, after being advised of his rights, Titus gave an oral statement to police in which he implicated "Mr. Hogan" as the shooter. The next day, when Hogan was brought to the police station, Titus recanted his earlier statement and identified Phipps as the shooter. Subsequently, Titus was interviewed by Assistant State's Attorney Concannon and Titus agreed to give a videotaped statement concerning his involvement in the shooting incident. In the videotaped statement, which was admitted at trial, Titus admitted that, on January 12, 2002, he and his friend "Meechie" (Phipps) devised a plan to rob a pizza deliveryman. Titus explained that he had in his possession a gun that he had taken from his girlfriend's house earlier that day. In his statement, Titus claimed that he gave the gun to Phipps and that Phipps had been the one who approached the deliveryman and, eventually, shot him. Titus said that, when Phipps approached the deliveryman on the stairs, the man "slipped" and fell to the ground. As the man lay on the ground, Phipps held the gun to the man's head and demanded money from him. Titus said he went through the man's pockets and removed some dollar bills. After that, he heard a gunshot and realized Phipps shot the man.

Titus further stated that, after the shooting, he and Phipps ran away in opposite directions. He said they met up shortly thereafter to split the money he had taken from the man. Titus claimed that the police arrived just as Phipps was handing the gun back to him. Titus said that when they saw the police, both he and Phipps ran. Also, Titus admitted that, while he was being chased by

the police, he threw the gun away, just before he got caught. At trial, defendant did not testify and the defense presented no evidence.

At an instruction conference during defendant's trial, the defense requested separate verdict forms for each of the counts of murder charged. That request was denied. The jury returned general verdicts of guilty of first degree murder and armed robbery. The trial court imposed a sentence of 38 years for first degree murder, with an additional 18-year sentence to run consecutively for the armed robbery.

On appeal, a different panel of the fourth division of the First District of the Appellate Court, following the decision in *Smith,* held that it was error for the trial court to have refused the defendant's request for separate verdict forms. The court affirmed Titus' convictions, but, as in *Smith,* modified his consecutive sentence for armed robbery to run concurrently with his sentence for murder.

## ANALYSIS

The State, as petitioner, argues that the appellate court erred in the cases at bar by instituting a new rule requiring trial courts to provide juries with separate verdict forms whenever a defendant is charged with felony murder in addition to intentional or knowing murder and the defendant requests separate verdict forms. The State contends that defendants have no statutory or constitutional right to separate verdict forms and whether such forms are to be given in any particular case is a decision which should be left to the discretion of the trial court. The State further contends that, in the two cases at bar, the trial courts did not abuse their discretion in refusing to provide separate verdict forms. The State contends that "the one good count rule" provides the means for interpreting the general verdicts handed down in these cases and, by employing this well-settled rule, we may presume that defendants were found

guilty of intentional murder—the most serious offense charged. Thus, the State asks us to reverse the appellate court judgments and affirm defendants' convictions and sentences as imposed by the trial courts.

In the alternative, the State contends that, even if the trial courts abused their discretion by refusing defendants' requests for separate verdict forms, we should reverse the appellate court judgments because, based on the facts of the cases at bar, the evidence overwhelmingly supports the convictions for intentional murder and, therefore, any error in refusing to give the separate verdict forms is harmless.

Finally, the State argues that, at the very least, we must reverse the appellate court with respect to the modifications it made to defendants' sentences. The State maintains that the remedy fashioned by the appellate court in these cases is contrary to law and, therefore, cannot be permitted to stand.

Defendants agree with the State that the appellate court erred when it modified the defendants' sentences as it did. However, defendants maintain that the appellate court was correct when it held that the trial courts erred when they refused defendants' requests for separate verdict forms.

Defendants agree that first degree murder is a single offense and, for that reason, it is constitutionally permissible to use a general verdict form, even when murder is charged in a multicount indictment based on different theories. See *Schad v. Arizona*, 501 U.S. 624, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991). It is defendants' position, however, that a trial court abuses its discretion when it denies a defendant's request for separate verdict forms if specific findings with respect to the separate counts of murder charged are necessary to a determination of the proper sentence that may be imposed.

Defendants contend that where, as here, a person is

charged with intentional, knowing, and felony murder and a general verdict of guilty is returned, the verdict lacks the specificity necessary for the sentencing court to know, beyond a reasonable doubt, on what basis the jury's verdict rested. Consequently, defendants argue, it is a violation of their fundamental right to due process and a fair trial for the trial court, having refused the request for separate verdict forms, to presume a conviction for intentional murder, which carries more severe sentencing consequences. Defendants ask that we affirm their convictions for murder, but impose sentences on the form of murder carrying the least serious sentencing consequences—felony murder. In the alternative, defendants request that we remand their causes for new trials.

We note at the outset—and the parties agree—that our review is *de novo*. As the State points out, although decisions regarding jury instructions and verdict forms are generally left to the sound discretion of the trial court, a trial court must exercise its discretion within the bounds of the law. *People v. Moore*, 207 Ill. 2d 68, 75 (2003); *People v. Williams*, 188 Ill. 2d 365, 369 (1999). In the cases at bar, the issue presented is whether the appellate court correctly held that the trial courts were required, because of the factual circumstances and legal principles at play, to provide separate verdict forms when the defendants asked for them. This presents a legal question, which we review *de novo*. See *People v. Parker*, 223 Ill. 2d 494, 500-01 (2006) (whether jury instructions accurately conveyed the law is an issue subject to *de novo* review).

### The One Good Count Rule and General Verdict Forms

In Illinois, the offense of first degree murder is set forth in section 9—1(a) of the Criminal Code of 1961 (720 ILCS 5/9—1(a) (West 2006)), which provides:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder."

While our statute describes three "types" of murder, first degree murder is a single offense. As we have explained on numerous occasions, " 'the different theories embodied in the first degree murder statute [citation] are merely different ways to commit the same crime.' " *People v. Cooper*, 194 Ill. 2d 419, 429 (2000), quoting *People v. Daniels*, 187 Ill. 2d 301, 316 (1999). In other words, "subsections (a)(1), (a)(2), and (a)(3) of section 9—1 of the Criminal Code, defining intentional murder, knowing murder and felony murder, delineate only the mental state or conduct that must accompany the acts that cause a death." *People v. Daniels*, 187 Ill. 2d at 313. Further, because first degree murder is a single offense, it is constitutionally permissible for jurors to return a general verdict of guilty even if there is no juror unanimity with regard to *the means* by which the murder was committed. *Schad v. Arizona*, 501 U.S. 624, 631-32, 115 L. Ed. 2d 555, 565, 111 S. Ct. 2491, 2497 (1991).

In *Schad*, the plurality held:

"We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission *** 'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Schad*, 501 U.S. at 631-32, 115 L. Ed. 2d at 556, 111 S. Ct. at 2497, quoting *McKoy v. North Carolina*, 494 U.S. 433, 449, 108 L. Ed. 2d 369, 384-85, 110 S. Ct. 1227, 1236-37 (1990) (Blackmun, J., concurring).

While it is certainly true that first degree murder is

but a single offense and, thus, a general verdict need not rest on a unanimous finding of a particular theory of murder, it is also true that there may be different sentencing consequences based on the specific theory of murder proven. For example, there are several aggravating factors, applicable only to murders committed intentionally or knowingly, which, if proven to exist, will support a sentence of death. See 720 ILCS 5/9—1(b) (West 2006). However, a person convicted of felony murder is eligible for the death penalty only if the sentencing jury finds beyond a reasonable doubt that the requirements of section 9—1(b)(6) have been proven, *i.e.*, that the defendant actually killed the victim or substantially contributed to his physical injuries and, in so doing, intended to kill or knew that his acts caused a strong probability of death or great bodily harm. 720 ILCS 5/9— 1(b)(6) (West 2006); *People v. Fuller*, 205 Ill. 2d 308 (2002) (death penalty vacated where sentencing jury was never instructed regarding the necessary (section 9—1(b)(6)) mental state requirements and a general finding of eligibility was returned); see also *People v. Mack*, 167 Ill. 2d 525, 538 (1995) (death penalty vacated where verdict form attempted to set forth the (section 9—1(b)(6)) statutory aggravating factor, but failed to do so completely and omitted an essential element).

In addition, a conviction for felony murder requires a sentencing treatment not applicable to convictions based on intentional or knowing murder. According to Illinois law, the predicate felony underlying a charge of felony murder is a lesser-included offense of felony murder. Thus, in accordance with the principles announced in *People v. King*, 66 Ill. 2d 551, 566 (1977), a defendant convicted of felony murder may not be convicted on the underlying felony. In such instances, the predicate offense will not support a separate conviction or sentence. *People v. Smith*, 183 Ill. 2d 425 (1998). Of course, there

are no such limitations if the defendant is found guilty of intentional or knowing murder. In those situations, separate convictions and sentences may be imposed on any additional charged offenses, including the felony underlying a charge of felony murder, if the defendant is found guilty of those offenses. Moreover, consecutive rather than concurrent sentences "shall be imposed" if one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury. 730 ILCS 5/5—8—4(a)(i) (West 2006).[1]

The State acknowledges, as it must, that in the cases at bar, the sentencing consequences would have been different if defendants had been found guilty of only felony murder and not intentional or knowing murder. Nevertheless, the State contends that we need not consider the "mere possibility" that the juries' general verdicts might be read in this manner. The State asks that we apply the "one good count rule" to uphold the trial court's determination that defendants were convicted of intentional murder, a ruling which the State contends is well supported by the facts in both cases.

The "one good count rule" is a legal construct that

---

[1]At the time defendant Smith committed the offenses for which he was convicted, section 5—8—4(a) (730 ILCS 5/5—8—4(a) (West 1998)) provided: "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***." Interpreting this statute, the trial court imposed a sentence of 20 years for Smith's conviction for armed robbery (of the bar) to run concurrently with his 60-year sentence for murder, but imposed a consecutive term of 8 years' imprisonment with respect to the attempted armed robbery (of Colon) conviction. This is because the trial court found that the severe bodily injury required by the statute was inflicted in conjunction with Smith's attempted armed robbery of Colon.

has been recognized in this state for well over a century, first appearing in *Curtis v. People*, 1 Ill. 256, 260 (1828). In *Curtis*, the defendant was charged in an indictment with assault with the intent to kill and simple assault. The jury returned a general verdict finding defendant guilty. On appeal, the court held that the count alleging assault with intent to kill was fatally defective. It was then urged by defendant that the general verdict could not stand because "the court could not know to which the jury applied the evidence." *Curtis*, 1 Ill. at 259. Rejecting the defendant's claim, the court found it well settled that "if one count in an indictment be good, although all the others are defective, it will be sufficient to support a general verdict of guilty." The court reasoned:

> "In the present case, the finding of the jury, of the guilt of the prisoner in making the assault with intent to kill, establishes an assault, whether it be accompanied with such intent or not; and although it is true, that the finding as to the first count is inoperative, yet it can not affect the finding as to the second. We are therefore of opinion that the general verdict of guilty is supported, although the first count is defective ***." *Curtis*, 1 Ill. at 260.

See also *Hiner v. People*, 34 Ill. 297, 304 (1864) (a rule of "uniform application" is that a general verdict may be sustained, although some counts are faulty, if there be "one good count").

The rationale behind this legal construct was explained in *Armstrong v. People*, 37 Ill. 459, 462-63 (1865). In *Armstrong,* the court noted that, at common law, a verdict was not valid unless it stated that the defendant was found guilty "as charged" or "as charged in the indictment." The court explained that, while these formalistic practices had been dispensed with and a general verdict finding a defendant "guilty" was permitted in a criminal prosecution, the meaning of the general verdict had to be discerned "in the light of common sense." *Armstrong*, 37 Ill. at 463.

"What was the jury trying in this case? and what was the plea? It was the specific offence charged in the indictment and the plea was not guilty of that offence. The jury responded to the issue, that the accused was guilty. Guilty of what? Can there be any other answer or reasonable understanding of the verdict, than that he was guilty of the offence charged? What other matter was the jury trying?" *Armstrong*, 37 Ill. at 463.

The *Armstrong* court explained further that a general verdict would not be sufficient if the defendant was charged with an offense and the "degree of the offense" was dependent on some factor not specifically found by the jury. See *Armstrong*, 37 Ill. at 464 (if "all the counts are of similar import, and the punishment the same under each and all" there is no necessity for anything more than a general finding of guilty by the jury).

As a corollary to the "one good count rule," courts have consistently held that, in a case where an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained. *People v. Scott*, 148 Ill. 2d 479, 555 (1992); *People v. Lymore*, 25 Ill. 2d 305, 308 (1962); *People v. Shannon*, 94 Ill. App. 2d 110 (1968). Of course, when a defendant is charged in several counts with a single offense and multiple convictions have been entered, the "one-act, one-crime" doctrine provides that judgment and sentence may be entered only on the most serious offense. *People v. Artis*, 232 Ill. 2d 156, 170 (2009) ("under the one-act, one-crime doctrine, sentence should be imposed on the more serious offense and the less serious offense should be vacated"); *People v. Mack*, 105 Ill. 2d 103, 137 (1984).

Applying these principles in the context of a general verdict murder conviction, it has been held that, where a

defendant is charged with murder in multiple counts alleging intentional, knowing, and felony murder, and a general verdict of guilty is returned, the defendant is presumed to be convicted of the most serious offense—intentional murder—so that judgment and sentence should be entered on the conviction for intentional murder and the convictions on the less serious murder charges should be vacated. *People v. Davis*, 231 Ill. 2d 349, 358 (2008) (if defendant is charged with intentional murder, strong probability murder and felony murder, and the jury returns a general verdict finding defendant guilty of murder, it raises a presumption that the jury found that the defendant committed the most serious crime charged, which is intentional murder); *People v. Morgan*, 197 Ill. 2d 404, 448 (2001) (same); *People v. Cardona*, 158 Ill. 2d 403, 412 (1994) ("[a] killing that occurs when acts are performed with the intent to kill or to do great bodily harm involves a more culpable mental state than does either a killing that occurs when acts are performed with the knowledge that they create a strong probability of death or great bodily harm or a killing that occurs in the course of a felony"); *People v. Thompkins*, 121 Ill. 2d 401, 455-56 (1988) (defendant convicted of multiple counts of murder in a general verdict is guilty as charged in each count to which the proof is applicable and where there is only one victim and multiple convictions are obtained for murder arising out of a single act, sentence should be imposed only on the most serious offense); *People v. Guest*, 115 Ill. 2d 72, 103 (1986).

Defendants do not challenge the continued vitality of the "one good count rule" or the corollary principles that stem from it. Rather, defendants question whether the presumption that arises from the application of these principles may be maintained when to do so would prejudice the defendant by subjecting him to more severe punishment. We agree with defendants that it may not.

Clearly, the "one good count rule" has long served as a practical mechanism for interpreting a general verdict. However, the rule has never been employed as a substitute for the jury's actual judgment when that judgment could not reasonably be ascertained from the general verdict. See *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931) (general verdict overturned where statute could be violated under any one of three theories, one of which was constitutionally invalid, and it was impossible to say under which clause of the statute the conviction was obtained); *Yates v. United States*, 354 U.S. 298, 1 L. Ed. 2d 1356, 77 S. Ct. 1064 (1957) (general verdict finding defendant guilty of conspiracy overturned where the verdict was supportable on only one of two grounds alleged and it was impossible to tell which ground the jury selected); *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979) (general verdict of murder overturned because court had "no way of knowing" whether defendant was convicted on the basis of unconstitutional instructions).

The State concedes in its brief that the use of general verdict forms in multicount indictments is not "impervious" and has been subject to limitations. However, the State distinguishes the *Stromberg* line of cases, relying on *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991), in which the Court held that a general verdict need not be set aside when "one of the possible bases of conviction was neither unconstitutional as in *Stromberg*, nor even illegal as in *Yates*, but merely unsupported by sufficient evidence." *Griffin*, 502 U.S. at 56, 116 L. Ed. 2d at 380, 112 S. Ct. at 472.

The State's reliance on *Griffin* is misplaced. In the cases at bar, defendants do not argue that their convictions for murder must be set aside. In fact, they concede that their murder convictions, which are based on the general verdicts finding them guilty of first degree

murder, are constitutionally valid. Thus, defendants do not challenge all general verdicts rendered on multicount indictments, nor do they repudiate the "one good count rule." Defendants simply argue that where, as here, the charge of murder is brought in a multicount indictment alleging intentional, knowing, and felony murder and the sentencing consequences would differ depending on the theory of murder proven, a general verdict does not provide the specificity necessary for the court to sentence defendant properly. This is because it is impossible to determine from a general verdict on what basis the jury found defendant guilty of first degree murder. In these circumstances, defendants contend, it is a violation of due process to deny a defendant the opportunity to have the jury decide his theory of defense, *i.e.*, that, at most, he is guilty of the less culpable offense of felony murder, and then sentence the defendant based on a *presumption* that he was convicted of the more serious offense of intentional murder, which carries more severe sentencing consequences. Defendants maintain that, because the presumption that arises from application of the "one good count rule" could work a prejudice against them at sentencing, the presumption cannot substitute for the jury's actual findings, at least where defendants have requested that the jury make specific findings with regard to the degree of the offense.

We agree with defendants and now hold that where, as here, specific findings by the jury with regard to the offenses charged could result in different sentencing consequences, favorable to the defendant, specific verdict forms must be provided upon request and the failure to provide them is an abuse of discretion. Accordingly, we affirm the appellate court's finding that, in the cases at bar, the trial courts erred when they refused defendants' requests for separate verdict forms.

Our holding here is consistent with the rulings of

courts in other jurisdictions confronted with the same or similar issue. See *Stuckey v. Trent*, 202 W. Va. 498, 505 S.E.2d 417 (1998) (the absence of jury verdict forms distinguishing the two theories of murder does not violate due process where the State does not proceed against the defendant upon the underlying felony); *State v. Giles*, 183 W. Va. 237, 395 S.E.2d 481 (1990) (in a prosecution for first degree murder, the State must submit verdict forms which distinguish between the two categories of first degree murder if, under the facts of the particular case, the jury can find the defendant guilty of either category of first degree murder and the State also proceeds against the defendant on the underlying felony); *Munson v. State*, 1988 OK CR 124, 758 P.2d 324 (because the jury's verdict did not specify which theory of murder appellant was found guilty of, the verdict had to be interpreted as one of felony murder so that appellant could receive the benefit of the rule that a defendant cannot be convicted of felony murder and the underlying felony); *Walker v. State*, 254 Ga. 149, 327 S.E.2d 475 (1985) (where defendants are charged with both malice murder and felony murder and general verdicts of guilty are returned, the verdict is to be interpreted as one of felony murder to give the defendant the benefit of the favorable sentencing consequence); *Burke v. State*, 248 Ga. 124, 281 S.E.2d 607 (1981) (same); *Reed v. State*, 238 Ga. 457, 233 S.E.2d 369 (1977) (same); *State v. Cromey*, 348 N.W.2d 759 (Minn. 1984) (fairness dictates that a general verdict finding defendant guilty of murder be considered the lesser felony murder); *State v. Fry & Jones*, 283 Md. 709, 393 A.2d 1372 (1978) (jury should be instructed to make specific findings so that the basis of its verdict will be revealed); *State v. Villani*, 491 A.2d 976 (R.I. 1985).

## Harmless Error

As noted above, the State argues that, based on the

strength of the evidence in the cases at bar, a finding that the trial courts abused their discretion in failing to provide separate verdict forms should not require reversal and remand for a new trial. The State contends that the evidence overwhelmingly supports a finding that the defendants were guilty of intentional murder and, for that reason, the failure to provide the jury with separate verdict forms may be deemed harmless error.

The State's argument is not well taken. As we explained in *People v. Mack*, 167 Ill. 2d 525 (1995), a verdict that is insufficient because it fails to set forth the jury's specific findings cannot be subject to harmless-error review because "[r]eview under the harmless error rule presupposes an *actual* verdict." (Emphasis in original.) *Mack*, 167 Ill. 2d at 539. Accordingly, we reject the State's claim that specific verdict forms, which would reveal the basis of the juries' findings on the counts of murder submitted to them, are rendered unnecessary simply because the evidence, in the State's assessment, "overwhelmingly" supports a finding that the defendants are guilty of intentional murder. We cannot substitute our own evaluation of the evidence for the findings of the jury. To do so would invade the province of the jury and deny the defendants their right to a fair trial.

Whether the trial courts' refusal to submit separate verdict forms can be deemed harmless error is not a question that may be resolved by looking at the strength of the evidence. The refusal to submit separate verdict forms is harmless error only if the jury's findings may be ascertained from the general verdicts entered. In *Mack*, we recognized the well-settled principle that " '[verdicts] should have a reasonable intendment, receive a reasonable construction, and not be set aside unless from necessity which originates in doubt as to their meaning *** or a failure to find upon some material issue involved.' " (Emphasis omitted.) *Mack*, 167 Ill. 2d at 537, quoting

*People v. Swinson*, 406 Ill. 233, 235 (1950). Further, we held that all parts of the record may be searched and interpreted together in determining the meaning of a verdict. *Mack*, 167 Ill. 2d at 537.

In *Griffin*, our Supreme Court, quoting *Turner v. United States*, 396 U.S. 398, 420, 24 L. Ed. 2d 610, 625-26, 90 S. Ct. 642, 654 (1970), held:

> " '[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive *** the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " *Griffin*, 502 U.S. at 56-57, 116 L. Ed. 2d at 381, 112 S. Ct. at 473.

In light of the principles set forth above, we look to the record to determine whether the meaning of the juries' general verdicts finding defendants guilty of first degree murder can be discerned.

We find that, in People v. Smith, the jury was instructed regarding the separate counts of murder as follows:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> First: That the defendant performed the acts which caused the death of Tony Colon and
>
> Second: That when the defendant did so, he intended to kill or do great bodily harm to Tony Colon, or he knew that his acts would cause death to Tony Colon, or he knew that his acts created a strong probability of death or great bodily harm to Tony Colon, or he was attempting to commit or was committing the offense of armed robbery.
>
> If you find from your consideration of all of the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all of the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

Similarly, in People v. Titus, the jury was instructed as follows:

> "First Proposition: That the defendant, or one for whose

conduct he is legally responsible, performed the acts which caused the death of Charles Gordon; and

Second Proposition: That when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill or do great bodily harm to Charles Gordon;

or

he knew that his acts would cause death to Charles Gordon;

or

he knew that his acts created a strong probability of death or great bodily harm to Charles Gordon;

or

he was committing the offense of Armed Robbery."

In the cases at bar, the theories of murder were listed in the disjunctive and the jury was instructed that it could find defendant guilty of murder if it found any one of the theories of murder alleged in the indictment. Under these circumstances, it cannot be said that the general verdicts demonstrate that the juries found defendants guilty on *each* of the theories of murder charged. As the Court recognized in *Schad*, when a defendant is charged with murder in multiple counts based on different theories, a general verdict finding the defendant guilty does not mean that the jury unanimously agreed that any one of the alleged means of committing the offense was proven beyond a reasonable doubt. It simply means that the jury unanimously agreed that the offense of murder was proven beyond a reasonable doubt. That determination can be based on any combination of findings with respect to the separate theories charged.

We conclude that where, as here, it is impossible to tell from the general verdict whether defendant was actually convicted on *each* count in the indictment, it is error for the trial courts to make that presumption. Therefore, in the cases at bar, because defendants were sentenced based on the *presumption* that they were found guilty of intentional murder, defendants were prejudiced and the

trial court's error in refusing the defendants' tender of separate verdict forms cannot be deemed harmless error.

## Remedy

On appeal, the appellate court affirmed the defendants' convictions for murder, but modified the defendants' sentences. Both the State and the defendants agree that the appellate court's sentencing modifications were contrary to law and cannot be upheld. Defendants suggest two different possible remedies. First, defendants argue that, based on notions of fairness, we should enter judgment and sentence on the form of murder which provides for the least severe punishment—felony murder. In this way, the convictions and sentences entered on the felonies underlying the offense of felony murder would be vacated in their entirety. In the alternative, defendants ask that we remand for new trials.

As discussed above, the general verdicts finding defendants guilty of first degree murder that the juries returned in these cases are entirely valid. There is no legal basis for setting defendants' murder convictions aside. Accordingly, the problem presented here is solely one of how to interpret the verdicts for purposes of sentencing.

As we have explained, the presumption that the general verdict is a finding that defendants are guilty of intentional murder cannot be maintained here because the trial courts refused the defendants' request for separate verdict forms, which would have made the basis for the juries' finding clear. Thus, we believe that, because defendants were prevented from obtaining a ruling on their theory that they were guilty only of felony murder and not intentional murder, the appropriate remedy is to interpret the general verdict as a finding on felony murder. Other jurisdictions, when presented with similar situations, have reached the same conclusion. See *Munson v. State*, 1988 OK CR 124, 758 P.2d 324 (because

the jury's verdict did not specify which theory of murder appellant was found guilty of, the verdict had to be interpreted as one of felony murder so that appellant could receive the benefit of the rule that a defendant cannot be convicted of felony murder and the underlying felony); *Walker v. State*, 254 Ga. 149, 327 S.E.2d 475 (1985) (where defendants are charged with both malice murder and felony murder and general verdicts of "guilty are returned, the verdict is to be interpreted as one of felony murder to give the defendant the benefit of the favorable sentencing consequence"); *Burke v. State*, 248 Ga. 124, 281 S.E.2d 607 (1981) (same); *Reed v. State*, 238 Ga. 457, 233 S.E.2d 369 (1977) (same); *State v. Cromey*, 348 N.W.2d 759 (Minn. 1984) (fairness dictates that a general verdict finding defendant guilty of murder be considered the lesser felony murder).

Accordingly, with respect to No. 104685, we affirm Smith's convictions for murder and armed robbery and the sentences imposed on those convictions, but vacate the conviction and sentence imposed for attempted armed robbery. With respect to No. 105575, we affirm Titus' conviction and sentence for murder, but vacate the conviction and sentence for armed robbery.

## CONCLUSION

For the foregoing reasons, we affirm the appellate court judgments in part, reverse in part, and remand these causes to the circuit courts so that defendants' mittimuses may be corrected as directed.

*Appellate court judgments affirmed*
*in part and reversed in part;*
*causes remanded.*