2021 IL App (1st) 201164-U

No. 1-20-1164

Filed November 24, 2021

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF A.M., a Minor, | ) ) | Appeal from the Circuit Court of Cook County |
| (The People of the State of Illinois, | ) ) | |
| Plaintiff-Appellee, | ) ) | No. 17 JD 244 |
| v. | ) ) | |
| A.M., a Minor, | ) ) | Honorable Linda J. Pauel, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Delinquency adjudication for first degree murder affirmed. Defense counsel's closing argument did not amount to ineffective assistance.

¶ 2    Following a bench trial, A.M. was adjudicated delinquent for first degree murder and armed robbery. The trial court sentenced A.M. to remain in the custody of the Illinois Department

of Juvenile Justice until the age of 21, with an extended jurisdiction sentence of 25 years' incarceration should he violate the conditions of his juvenile sentence. We affirm.[1]

¶ 3                                I. BACKGROUND

¶ 4          A.M.'s adjudication stems from the armed robbery and shooting death of Luis Corona on the night of October 29, 2016. The State proceeded on one count of armed robbery and three counts of first degree murder, with each murder count based on a separate theory: that A.M. intended to kill Corona, that A.M. knew his actions created a strong probability of death or great bodily harm, and that Corona was killed during the forcible felony of armed robbery, that is, felony murder.

¶ 5          Evidence adduced at trial showed that A.M. was at the home of Jesse Romero, where they and another friend, Nick Solis, were smoking marijuana. A.M. asked Romero to call Corona, his "weed dealer," to set up a meeting so that A.M. could purchase more marijuana from Corona. Romero set up the meeting but did not go with A.M. to meet Corona. Corona arrived nearby driving his mother's red Dodge van. Corona's friend, Matthew Ledesma, was in the front passenger seat. A.M. and another individual[2] approached the van and asked Corona if they could get inside. Corona pressed a button, opening the automatic side door, allowing them both to enter. A.M. and the other individual entered the van and sat in the back seats. A.M. then asked Corona to drive around the block. Corona did so and eventually drove down an alley at A.M.'s direction, pulling over when A.M. said, "right here's fine."

¶ 6          After stopping in the alley, A.M. asked to see the marijuana. Corona handed A.M. a plastic baggie containing marijuana. A.M gave the baggie to the other individual and then displayed a silver pistol with an extended magazine. A.M. demanded Corona and Ledesma surrender all their

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.
[2]The prosecutor identified this person as Bryce Camacho, who went by the nickname Soup. No witness testified to this, but some evidence indicated the person who was with A.M. was named Bryce.

marijuana and money. Corona and Ledesma gave A.M. cash and marijuana and asked A.M. to get out of the van. A.M. insisted they must have more and demanded they hand it over. Corona then handed A.M. cash from a cup holder. He and Ledesma told A.M. they had given him everything. A.M. then demanded that Corona and Ledesma exit the van. Corona told A.M. the van belonged to his mother, and, so, he could not give it to him. Corona then told A.M. he had their cash and drugs, so he should just go.

¶ 7        The side panel door stuck as Corona struggled to open it. Eventually, the door slid open, and A.M.'s companion exited the van. A.M. remained inside and continued to demand Corona give him the van. Corona told A.M. to "chill" and get out of the van. As A.M. took a step outside of the van, Corona attempted to drive away. A.M. then fired a shot, striking Corona in the back, causing him to collapse and lose control of the van. Ledesma grabbed the steering wheel, and the van came to a stop after sideswiping two parked cars and striking a tree. Ledesma called 911. Paramedics found Corona deceased upon their arrival.

¶ 8        A.M. returned to Romero's porch following the shooting. A.M. had some marijuana and about $150 in cash. A.M. displayed the magazine from his silver Ruger handgun and, referring to shooting Corona, stated that "he had to do what he had to do." Two weeks later, A.M. told Romero that he had tricked Romero into setting up the robbery since A.M. thought Romero would not have arranged a meeting with Corona if he had known of the plan to rob him. A.M. later told Romero, "not to talk to the law but he killed [his] boy."

¶ 9        The trial court found A.M. delinquent on two separate counts of first degree murder: one count premised on knowing one's acts create a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2016)), and the other count premised on felony murder (720 ILCS 5/9-1(a)(3) (West 2016)). The court found the State had not met its burden on the remaining count

of first degree murder premised on intent to kill (720 ILCS 5/9-1(a)(1) (West 2016)). The court reasoned that the evidence was not sufficient to show that A.M. "originally intend[ed] to kill [Corona]." In addition, the court found A.M. delinquent of armed robbery. At sentencing, the court ordered A.M. to remain in juvenile custody until age 21 and imposed a 25-year prison term if A.M. fails to comply with the conditions of his juvenile sentence. This appeal followed.

¶ 10                                   II. ANALYSIS

¶ 11        On appeal, A.M. first argues that Illinois's felony murder statute is unconstitutional as applied to juveniles, claiming that convicting a juvenile based on felony murder violates due process. He asserts juveniles are less culpable due to their immaturity and are less capable of appreciating the risks that could result from participation in a forcible felony. A.M. relies on decisions of the United States Supreme Court, including *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012), to argue that precedent in which the Court made constitutional distinctions between juvenile and adult offenders should be extended to afford juveniles greater protection against liability for felony murder. He further cites academic literature noting that the prefrontal cortex, which is associated with decision-making and regulating behavior, is not fully developed in adolescents, making them less capable of considering the risks and consequences of their actions. Given that culpability under a theory of felony murder is premised on the foreseeability of death resulting from the events set in motion by the commission of a forcible felony, A.M. argues felony murder is not rationally applied to juveniles since their ability to foresee such consequences is lacking as compared to adults.

¶ 12        We note that felony murder is not an offense itself. Rather, felony murder is one of the various ways to commit the offense of first degree murder. *People v. Smith*, 233 Ill. 2d 1, 16 (2009). Our supreme court has consistently maintained that first degree murder is a single offense and

Illinois' first degree murder statute merely embodies three different theories for establishing liability for the offense. *Id.*

¶ 13      In this case, A.M. was adjudicated delinquent based on the offense of first degree murder. The State charged A.M. with that offense under three different theories and the trial court found that the State had proven two of them, including felony murder. Nevertheless, it remains a single offense. Apart from its finding on the felony murder theory, the trial court found, and the evidence showed, that A.M. knew that firing a handgun into the van at Corona created a strong probability of death or great bodily harm. That was sufficient to prove that A.M. committed first degree murder and his adjudication may be affirmed on this basis alone. For that reason, it is not necessary for us to consider A.M.'s liability under the separate theory of felony murder. As a further consequence, we need not address A.M.'s constitutional challenge. "[C]ourts must avoid reaching constitutional issues unless necessary to decide a case." *People v. Bass*, 2021 IL 125434, ¶ 30. Resolution of the constitutional issue A.M. raises is not necessary to decide his case.

¶ 14      We note, however, that panels of the Illinois Appellate Court have rejected similar challenges. See *People v. O'Neal*, 2021 IL App (4th) 200014 and *People v. Watson*, 2021 IL App (1st) 180034. We further note that the facts of this case seriously undermine A.M.'s claim that he was incapable of foreseeing the consequences of his actions. Despite being 15 years of age, A.M. exhibited considerable forethought and calculation. First, as he admitted to Romero, he deliberately withheld that he intended to rob Corona when he solicited Romero to arrange the marijuana transaction, as he knew Romero would not have done so if he were aware of A.M.'s intentions. Second, after entering the van, A.M. directed Corona to drive to a secluded alley before displaying a firearm and announcing a robbery. By doing so, A.M. manipulated the circumstances to better effectuate a robbery. Third, A.M. brought and displayed a handgun. That act reveals his

understanding that a threat of deadly force was necessary to compel Corona and Ledesma to surrender their money and drugs. Last, A.M.'s statement that he "had to do what he had to do" after Corona refused to surrender the van indicates that he reasoned it was necessary to follow through with his threat of deadly force. Otherwise, A.M. would show his threats need not be taken seriously. These facts show A.M. knew precisely what he was doing and made deliberate decisions toward achieving his ends. In our view, this case tends to support holding similarly situated juveniles culpable based on felony murder rather than weighing against it.

¶ 15    Separately, A.M. contends he was deprived of the effective assistance of counsel because his trial counsel's closing argument did not effectively articulate that A.M. was only proven to have committed involuntary manslaughter rather than first degree murder. He asserts that counsel put forth a legally invalid argument that his young age alone prevented him from forming the mental state necessary for first degree murder. Instead, he contends counsel should have argued that A.M. acted recklessly, not intentionally or knowingly, and, therefore, should only be found to have committed involuntary manslaughter. He acknowledges that counsel mentioned involuntary manslaughter but asserts that counsel did not follow through with explaining that the evidence showed A.M.'s mental state was reckless. Absent that argument, he submits, the trial court had no choice but to adjudicate him delinquent of first degree murder. Had counsel made such an argument, A.M. claims counsel would have negated that he acted under a knowing mental state and the court may have adjudicated him delinquent of involuntary manslaughter instead of first degree murder.

¶ 16    Reviewing the transcript of counsel's closing argument, we disagree that counsel failed to articulate a basis for the court to consider and find A.M. committed involuntary manslaughter rather than first degree murder. We reproduce relevant portions as follows:

"A dark alley. A 15-year-old child pulls the trigger on a gun, and that changes everything.

***

I think the grappling here is, what happened in that alley? What are the words for what happened? How do we process that? [A.M.] pulled the trigger on a gun in that dark alley on October 29, 2016, but the question is, what crime did he commit.

The State chose to charge him with first degree murder, and the first two propositions require intent, the second one knowingly that it would cause the damage. But hasn't a recent case raised some sort of mixed question about what kind of intent a 15-year-old can even have? Doesn't *Miller* and *Buffer*[3] and all those cases tell us that their brains are not fully developed? It makes us think, can a 15-year-old ever truly have that intent to kill? Can they truly understand the consequences? Especially, your Honor, when we're talking about a firearm. Just a quick twitch of the finger. Does a 15-year-old truly understand and intend to kill someone when they're not even shooting at someone? They're shooting at a minivan. They're shooting through the door of a minivan. How would we even know if he intended to hit anyone?

The State would say, I assume, that this could not be an involuntary manslaughter because we have a line of cases that tell us that we can't have involuntary manslaughter when someone aims and points a gun. It's cliché. It's one of those phrases everyone's like, ['oh, you just can't do that.['] But if you really look at where those cases come from, they come from the cases where the main fact situation was that you had an individual that walked away from a group of people, came back to a corner, pulled out a gun, and shot into a group of seven people. That's where the proposition that you can't fire a gun and

---

[3]*People v. Buffer*, 2019 IL 122327.

have involuntary is. That is not what we have here. Your Honor, we have one shot into a minivan by a 15-year-old."

¶ 17        Counsel went on to argue that the State had not proven armed robbery nor, therefore, felony murder premised upon armed robbery. She posited that the evidence was favorable to A.M. on this charge. Ledesma was not credible, in her view, because he initially stated he and Corona were there to buy marijuana and only later admitted they were selling it. Some cash was found on Corona's body. Immediately after the shooting, A.M. told Romero that Corona and Ledesma had tried to rob him. Counsel suggested that Romero's statements indicating A.M. robbed Corona were made under pressure that he might be charged since he had called Corona's cell phone before the shooting. She further suggested Romero needed to deflect responsibility to avoid retaliation since "people were talking" on the street. Counsel further argued it was improbable that A.M. would rob and attempt to "carjack" Romero's "weed dealer" near Romero's house as that would enable Corona to easily find A.M. through Romero.

¶ 18        Considering the whole of counsel's closing argument, we disagree that her argument was limited to the assertion that A.M. did not have the mental state for first degree murder solely because of his age. Rather, in context, counsel suggested A.M.'s age was a factor along with other facts and circumstances of the case to contend that his mental state was likely lesser than the intentional or knowing culpability elements for first degree murder. The other facts and circumstances were that it was dark, a tense situation, and that A.M. fired into the minivan after Corona abruptly started to pull away. Counsel intimated that A.M. may have reacted to the van moving and his shot was aimed at the van, not its passengers.

¶ 19        Further, we reject the contention that the trial court had no choice but to adjudicate A.M. delinquent for first degree murder based on counsel's closing argument. Although counsel did not

use the word "reckless," nor expressly assert that A.M. possessed the mental state for involuntary manslaughter, this line of reasoning was implied. In addition, counsel contended that this case was factually distinguishable from other cases where courts had found shootings could not be involuntary manslaughter. In our view, it was not lost on the trial court that counsel was arguing for a finding of involuntary manslaughter instead of first degree murder. In a bench trial, the court is presumed to know and properly apply the law unless the record affirmatively shows otherwise. *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 41. Nothing in the record before us rebuts the presumption that the court knew it could adjudicate A.M. delinquent of involuntary manslaughter if it found he acted recklessly but considered and rejected that option based on the evidence. To the contrary, the trial court alluded to counsel's argument that A.M. had merely fired into the van while stating reasons that the court found A.M. acted knowing that doing so created a strong probability of death or great bodily harm.

¶ 20        We further note that counsel offered thorough argument against finding that A.M. committed armed robbery, and, therefore, not felony murder. That was a necessary corollary to obtain a finding of involuntary manslaughter in this case. The count charging A.M. with first degree murder based on felony murder did not contain a mental state. Thus, involuntary manslaughter was not a lesser included offense of first degree murder under that theory. See *People v. Phillips*, 383 Ill. App. 3d 521, 546 (2008) (involuntary manslaughter is not lesser included when the charging document does not contain a mental state when describing felony murder). So, even if the court were to find the State had not proven a knowing mental state, felony murder was an alternate basis to find first degree murder. Consequently, counsel needed to argue against the felony murder theory in addition to the knowing element to obtain a finding of involuntary manslaughter.

¶ 21    In sum, we find that the record supports that counsel competently argued in favor of a finding of involuntary manslaughter instead of first degree murder. Her arguments were in accord with applicable law and described a view of the evidence that supported such a finding. The record does not support A.M.'s contrary contentions.

¶ 22    To establish a deprivation of the effective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, that is, falling below an objective standard of reasonableness, and (2) resulting prejudice, that is, a reasonable probability that the outcome of the proceeding would have been different. *People v. Dupree*, 2018 IL 122307, ¶ 44. A defendant must overcome the strong presumption that counsel's challenged action or inaction may have been the product of sound trial strategy. *Id.* Generally, matters of trial strategy will not support an ineffectiveness claim. *Id.* "The content of closing argument is generally considered a matter of trial strategy." *People v. Shamlodhiya*, 2013 IL App (2d) 120065, ¶ 15.

¶ 23    Here, A.M. cannot overcome the presumption of sound trial strategy as we have found that the record does not support the deficiency he alleges. Even if counsel had expressly argued that A.M. acted recklessly, we do not believe there is a reasonable probability the outcome would have been different. As counsel noted, Illinois courts have consistently held that "when the defendant intends to fire a gun, points it in the general direction of his or her intended victim, and shoots, such conduct is not merely reckless ***." [Internal quotation marks omitted.] *People v. Himber*, 2020 IL App (1st) 162182, ¶ 37. This principle has been applied when a defendant fired into an occupied vehicle. See *People v. Minniefield*, 2014 IL App (1st) 130535, ¶¶ 83-85.

¶ 24    For these reasons, A.M. cannot establish that he was deprived of the effective assistance of trial counsel.

¶ 25                                    III. CONCLUSION

¶ 26        Based on the foregoing, we affirm the judgment of the trial court.

¶ 27        Affirmed.