# Illinois Official Reports

## Appellate Court

---

### *People v. Hill*, 2014 IL App (2d) 120506

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRANK HILL, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-0506 |
| Filed | March 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court did not abuse its discretion by allowing evidence of decedent's state of mind, when that evidence–notes written by decedent and then subsequently read by defendant–were admitted to show the effect they had on defendant and not for the truth of the matter asserted; moreover, defense counsel was not ineffective for failing to request separate verdicts on the State's three theories of first-degree murder when defendant's theory at trial was that he did not commit the offense and the decision not to separate felony murder from the other offenses was likely a sensible tactical decision. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07-CF-738; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Thomas A. Lilien and Bruce Kirkham, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     In the direct appeal of his first-degree murder and aggravated arson convictions, defendant, Frank Hill, raises two issues. The first is whether the trial court abused its discretion by allowing evidence of decedent Karyn Pearson's state of mind. The second is whether his counsel was ineffective for failing to ask for separate verdict forms for first-degree murder. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Around 5 a.m. on January 9, 2007, emergency personnel responded to a fire at decedent's townhouse in Gilberts, Illinois. The fire had engulfed decedent's townhouse and destroyed several of the adjacent units. The townhouse units to the north and south of decedent's unit were heavily damaged by the fire. Once firefighters extinguished the blaze, they discovered decedent's charred body on the remains of a sofa in the living room area on the first floor. Investigators were able to determine that gasoline had been used as an accelerant and that the fire's point of origin was the area around decedent's body.

¶ 4     Defendant and decedent shared the residence, which decedent and her mother co-owned. The townhouse was located in a six-unit building and was the third unit from the north. Defendant and decedent had been in a relationship for about five years. Decedent had two cars. Decedent and her mother co-owned a silver Jaguar, which defendant drove. Decedent drove a black Mercedes SUV that was provided to her by her employer.

¶ 5     A Gilberts policeman was dispatched to the townhouse at 5:11 a.m. and found flames coming from the rear, or west, side of the unit and moving up to the second story. Decedent's Mercedes was parked in the driveway. When firefighters arrived at the scene around 5:20 a.m., the townhouse was fully engulfed by fire. Eight fire departments responded and finally brought the fire under control at 6:30 a.m.

¶ 6     Defendant spoke with Gilberts police sergeant Jack Rood at a fire station in Gilberts later that day. Police told defendant that a body believed to be his girlfriend was found in the burned townhouse. Rood said that defendant did not seem surprised or in shock. Defendant told police

- 2 -

that the night before the fire, on January 8, he visited friends Paul Bilecki and Vanessa Roux and went home at 11:30 p.m. Defendant said that decedent called him about 12:50 a.m. and arrived at the townhouse about 1:20 to 1:30 a.m. Decedent told defendant that he did not have to move out of the townhouse, and she went upstairs to read a book. Defendant said that he changed his clothes and left the townhouse about 3 or 3:30 a.m. to drive to Indiana to visit a friend. Shortly after leaving the townhouse, defendant remembered that he was supposed to take a hard hat to a coworker, so he went back and retrieved it from the garage. He met the coworker and delivered the hard hat at a Mobil station in Schaumburg about 4 a.m. and immediately went to Indiana. At 6:20 a.m., defendant called his boss and said that he would not be at work, because his side hurt from an ulcer.

¶ 7 Police interviewed defendant again at the police station. Defendant drove to the station in the silver Jaguar. Defendant told police that he could not be certain of the times of his actions, because he did not have a watch and the clock in the Jaguar was not working. Police searched the car and collected an I-Pass transponder from the vehicle. From the trunk, police recovered an empty gas can, which smelled of gasoline and had no cap.

¶ 8 Defendant was charged with three counts of first-degree murder: intentional murder, knowing murder, and felony murder (720 ILCS 5/9-1(a) (West 2006)). He was also charged with aggravated arson (720 ILCS 5/20-1.1(a)(1) (West 2006)).

¶ 9 Prior to trial, the trial court granted two motions *in limine* to admit decedent's various statements to coworkers, email exchanges with friends, and three Post-It notes, which were found in the kitchen/family room area, and a handwritten note on the back of a letter, which was found in a garbage can located in the garage of the burned townhouse (Post-It notes and handwritten note referred to collectively as notes). These were discovered by agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) who were sorting through the ashes and debris.

¶ 10 At trial, Beth Eichinger, an evidence technician for the Carpentersville police department and a member of the Kane County Major Crimes Task Force, testified that she began collecting evidence in the northwest corner of the residence, in what she called the "family room area," where decedent's body was located. Eichinger was looking for fire debris to be tested for accelerants and any other evidence that would be of value to the investigation. As Eichinger and the ATF agents were going through debris, the ATF agents found some handwritten Post-It notes on a stack of some debris. She testified that the ATF agents were removing large amounts of ash within that area, "[a]nd when they lifted a large amount of ash, they recovered some notebook style papers. And when I opened them, these three pieces of Post-It notes were located within that notebook paper." The Post-It notes were loosely stacked.

¶ 11 On cross-examination, Eichinger attempted to describe the kitchen/family room area. She explained that it was hard to tell where one room began and ended. Without walls or dividers, it was hard for her to say whether it was a family room or a kitchen, so she chose to describe it as the "family room, kitchen area." Eichinger confirmed that she was present when the ATF agents were digging up all of the ash and the soot. "Once they had flipped over the large amount of ash soot, is when we started going through items and they are the ones who actually discovered it." Eichinger confirmed that the Post-It notes were "slightly disoriented within the folded pieces of notebook paper." The ATF agents also recovered a handwritten note written on the back of a letter in the trash can in the garage of the townhouse. Neither the notebook

paper upon which the Post-It notes were placed nor a photograph of the notebook paper was admitted into evidence.

¶ 12 The note found in the trash can in the garage read: "You put your hands on me for the last time Leave my car & house keys were thru. I loved you so much and you took it for granted." The numeral 62 was crossed out at the bottom. The three Post-It notes found in the kitchen/living room area stated: "I'm tired of your cheating and lies"; "It's over bye"; and "Move out!!"

¶ 13 Decedent's mother, Mary Jo Pearson, identified the handwriting on the notes as that of her daughter. She explained that "62" was her and decedent's code for "I love you."

¶ 14 Pearson testified that her daughter had been living at the townhouse for less than a year. She described the layout of the townhouse. It consisted of two stories and had an attached two-car garage. There was a walkway around the garage to the front entrance. Once inside the entrance, a "little hallway" led to the living room, which was located at the northwest corner of the townhouse. The living room was two stories high and a loft was located off to the side. A sketch of the interior design of the townhouse showed that the kitchen was located next to the living room/dining room area.

¶ 15 Pearson further testified about the weekend before her daughter had died. Pearson stated that decedent came over very early on Sunday morning, sometime between 7 and 7:30 a.m. It was not a planned visit and it was unusual for her to come over at that time. Pearson stated that her daughter was very upset and walked into the house crying. Her daughter stayed the rest of the morning and left sometime later in the day, around 7 or 7:30 p.m. Decedent returned to Pearson's house around 10 p.m. and stayed the night, despite the fact that the townhouse was less than a mile from Pearson's house.

¶ 16 On cross-examination, Pearson testified that she was expecting decedent to return to her house late on January 8, after work, but when Pearson called her daughter and asked if she was returning to Pearson's house that night, she said no.

¶ 17 The State presented the following testimony of several of decedent's coworkers. Robert Petzold, who worked with decedent, testified that decedent said her boyfriend was upset about her use of the Mercedes SUV supplied by her employer; she and defendant could not stand each other; she was having difficulty being with defendant; she wanted to spend the weekend away; she spent much of the weekend at her mother's house; she was home only for a change of clothing; she "kicked her boyfriend to the curb" over the weekend; defendant was supposed to be at the townhouse packing and moving out; and decedent asked if Petzold knew of a service that could change the locks at the townhouse.

¶ 18 Doris Garcia, another coworker, testified that decedent said she was done with her relationship with defendant and wanted out; she was having a difficult time getting defendant to agree to end the relationship; and she argued with defendant and drove around for a couple of hours.

¶ 19 Another coworker, Kevin Hargadon, testified that decedent said she and defendant were fighting more frequently; she asked defendant to leave, but he refused because he was part of the household; and she was going home for a change of clothes and then going to her mother's house.

¶ 20    Another coworker, Leon London, Jr., testified that decedent said that she did not want to be in the relationship with defendant anymore and that she was scared and did not want to go home.

¶ 21    A fifth coworker, Paul Spirek, testified that decedent said defendant called her earlier that night and said he was tracking her on her phone and knew where she was located and that decedent was afraid after talking to defendant. He further testified that decedent said she was going to stay at her mother's house, but she wanted to go home and get clean clothes for work the next day.

¶ 22    A friend of decedent, Lativa Garcia, testified about a series of five emails she and Antwaun Howard, another friend, exchanged with decedent on the day before her death. The emails state:

> 1. "Yes, and MJ apparently:)
> I'm sticking with my decision so guys I love you and hope you will miss me:)
> Antwaun you got the jag
> Tee you got the house hehehehehe"
> 2. "Guys just don't let me back down ok"
> 3. "I'm not going home until he is gone"
> 4. "Whatever I want out so I have to do whatever I need to"
> 5. "He just called all normal like 'Hey where are you at[?]' Hmmmmmmmmmm I wonder 11 on a mon work[.] Wonder what he is planning[?]"

¶ 23    Neighbors testified that, on the night in question, both the Mercedes and the Jaguar were parked in the driveway; witnesses heard a loud argument in decedent's townhouse around 4:30 a.m. and saw the Jaguar back out of the driveway and drive away "real fast" around 4:50 a.m., about 10 minutes before they noticed the fire.

¶ 24    Aimee Stivers Palys lived directly across the driveway from decedent's townhouse. She did not know decedent well, but had had telephone and instant message conversations with defendant, who had "innocently flirted" with her. Palys knew defendant drove a silver Jaguar and decedent drove a Mercedes SUV that they parked outside on their driveway rather than in the garage. About 8:40 p.m. on January 8, defendant called Palys on her phone and asked her to come over or if he could come to her home. Palys told him no. She testified that defendant sounded intoxicated and told Palys that he was drunk. Defendant said that decedent was not planning on being in the townhouse that week. About 9:30 p.m., Palys got an instant message from defendant saying that he and two neighbors were at a neighbor's house and asking if she would come over or if they could come over. Palys responded that she would not come over and would not open the door if they came to her home.

¶ 25    Palys was awakened by her alarm clock about 4:45 to 4:50 a.m. on January 9. She looked out her window and saw the Jaguar and the Mercedes in front of decedent's garage. Palys saw no sign of fire, but she saw a flickering light similar to that made by a television. Palys took a shower and heard pounding on her door and her dog barking. Palys went into her bedroom, felt heat, and saw decedent's unit engulfed in flames. She called 911 and about 5:30 a.m. she called defendant at the number he used to call her the night before. The call went to voicemail and Palys left a message asking if defendant and decedent got out of the townhouse safely. Defendant returned her call at 12:56 p.m.

¶ 26 Douglas Wahl of the Elgin fire department obtained defendant's cell phone number from Palys during an interview. Wahl called the number and left a message for defendant, who returned the call five minutes later.

¶ 27 Jeff Strohm, a custodian of records for Sprint Nextel Telecommunications, testified about a call detail record of defendant's cell phone made on January 9, 2007. The record shows the time a call was initiated; whether the call was incoming or outgoing; the duration of the call in seconds; whether the call was forwarded to voicemail; the number of the other phone used in the call (when both numbers were the same, the caller was checking his voicemail); the cell tower used by defendant's phone at the beginning of the call; and the cell tower used by defendant's phone at the end of the call.

¶ 28 Hammad Shiekh testified as an expert in radio frequency engineering. Sheikh worked for Ericsson, which is a partner with Sprint. Because the Elgin area, including Gilberts, is considered urban/suburban, local cell phone towers have a range of up to two miles. So, Sheikh said, in general, defendant's phone probably was within two miles of the tower that defendant's phone used to originate or terminate a call in a suburban area.

¶ 29 Nicholas Krueger, employed by the Kane County Geographic Information Systems Technology Department, testified as an expert in creating custom maps. He used the information obtained from the cell phone company to create maps by plotting the latitude and longitude of each cell phone tower used by defendant's cell phone on January 9, 2007, between 4:52 and 8:52 a.m. The State presented to the jury the maps showing the tower locations for the 31 cell phone calls made or received through defendant's cell phone between 4:52 and 8:52 a.m. that day. The cell phone records and tower locations show that defendant made or received three calls at 4:52, 5, and 5:03 a.m., which used the Gilberts cell tower, located 0.86 miles from decedent's townhouse. The locations of the towers then generally progressed to the east for the subsequent calls and eventually the cell phone used towers in Indiana for calls at 7:51 a.m. or later.

¶ 30 Records of the use of the I-Pass transponder seized from the Jaguar showed that it was used on January 9, 2007, at 5:11 a.m. in the eastbound lanes of the I-90 toll road at the Elgin toll plaza. The transponder was used at 5:16 a.m. at the Route 59 exit ramp from eastbound I-90. Rood earlier testified that, on February 1, 2007, he drove at the speed limit from the townhouse to the Elgin toll plaza, and the trip took nine minutes.

¶ 31 Bart Piet, defendant's employer, testified that the weekend of January 5-7 he talked by telephone with defendant, who told him that he needed a day off because of problems with his girlfriend and because he needed to move. Piet and defendant talked about travel arrangements for a new employee. Defendant was to pick up a hard hat for the new employee at the company's office in Gilberts.

¶ 32 Richard Cavins, a foreman for defendant's employer, testified that defendant left a message on Cavins' cell phone at 6:13 a.m. on January 9 saying he was not feeling well and was not coming to work.

¶ 33 Humberto Garcia was scheduled to start his first day of work for defendant's employer on January 9, 2007. He testified that he planned to ride with defendant to a Chicago job site. Garcia spoke with defendant on the night of January 8 and they arranged to meet at 5 a.m. at the employer's office in Gilberts. Defendant instructed Garcia to call him on his cell phone when Garcia woke up on the morning of January 9. Garcia called defendant's cell phone

around 4:05 a.m. and got no answer. Garcia went to the Gilberts office and tried to call defendant at 4:52 and 5 a.m., and his calls were forwarded to voicemail.

¶ 34 Defendant returned Garcia's calls at 5:03 a.m. and said that he was not going to work, because his daughter was sick and he had to take her to the hospital. Garcia said that he needed a hard hat and defendant told him that he had a hard hat for him and would meet him at an undetermined location in Schaumburg. Garcia drove toward Schaumburg and tried calling defendant about 5:30 a.m. Defendant called back about 5:45 a.m. and told Garcia to meet him at a Mobil station located at Schaumburg Road and Plum Grove. Defendant, driving a silver Jaguar, arrived at the station around 5:50 a.m. Defendant left the station about 5:55 or 6 a.m. He appeared normal and Garcia noticed nothing out of the ordinary.

¶ 35 The trial court instructed the jurors before admitting the various hearsay statements, emails, and notes and again during final instructions that the statements and writings about future events were offered to show decedent's state of mind and intent and to show defendant's possible motive. The court further instructed that, if the jury determined that decedent did say or write them, any statements and writings by decedent about past events were offered not for the truth of the matters asserted but to show the basis for decedent's state of mind and intent.

¶ 36 Following closing argument, the parties submitted to the jury a general verdict form on first-degree murder. The trial court instructed the jury with an instruction consolidating the three theories of first-degree murder alleged in the indictment–intentional, knowing, and felony murder–into a single proposition. The jury found defendant guilty of first-degree murder and of aggravated arson. The trial court sentenced defendant to consecutive prison terms of 60 years for first-degree murder and 30 years for aggravated arson.

¶ 37 Defendant timely appeals.

¶ 38                                    II. ANALYSIS

¶ 39 Defendant first contends that evidence of decedent's statements and notes concerning her relationship with defendant was inadmissible hearsay. Specifically, defendant challenges the admissibility of (1) the statements made to coworkers; (2) the email exchanges with friends; and (3) the notes found at the townhouse.

¶ 40                                    A. Forfeiture

¶ 41 Before reaching this contention, however, it is necessary to consider the State's claim that this issue has been forfeited for purposes of review. Citing *People v. Denson*, 2013 IL App (2d) 110652, ¶ 9, *appeal allowed*, No. 116231 (Ill. Sept. 25, 2013), the State asserts that defendant failed to preserve this claim for review by failing to object at trial.

¶ 42 In *Denson*, the defendant contended on appeal that the trial court abused its discretion by admitting various statements made by the codefendants. The State contended that the defendant had forfeited this issue. Although the defendant had filed a response in opposition to the State's motion *in limine* to admit the testimony, argued against the motion, and contended in his posttrial motion that the trial court erred in granting the motion, he had not objected to the introduction of this evidence during the trial. *Id.* ¶ 7. We observed that "the denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is later introduced at trial" and that "a contemporaneous objection to the evidence at the time that it is

offered is required to preserve the issue for review." *Id*. ¶ 9. Because the defendant had failed to object at trial, we held that the defendant had forfeited his argument on appeal. *Id*. ¶ 10.

¶ 43 Here, the State filed two motions *in limine* to admit decedent's statements, emails, and handwritten notes. Defendant objected to the admission of this evidence both prior to trial and in his posttrial motion. However, unlike in *Denson*, defense counsel made a continuing objection to the admission of this material, which objection the trial court acknowledged. Under these circumstances, we find that defendant preserved his objection.

¶ 44                                             B. Standard of Review

¶ 45 We next address the applicable standard of review for the admission of hearsay statements. Defendant contends that the trial court's decision is subject to *de novo* review, and the State argues that it should be reversed only for an abuse of discretion. We agree with the State.

¶ 46 Defendant cites *People v. Munoz*, 348 Ill. App. 3d 423 (2004), for the proposition that the ruling is subject to *de novo* review because either (1) the court reached its decision without assessing the credibility of witnesses or (2) the court's exercise of discretion " ' "has been frustrated by an erroneous rule of law." ' " *Munoz*, 348 Ill. App. 3d at 438 (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001), quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)). In *Munoz*, the trial court found that certain hearsay testimony was not admissible under the state-of-mind exception, based on the concept that "hearsay declarations relating to the contemplation of suicide are generally inadmissible, unless they are part of the '*res gestae*,' a contemporaneous act of the decedent that such statements might characterize or explain." *Id.* at 434. On appeal, the *Munoz* court determined that the appellate court had "long held that a person's state of mind 'may be proved by testimony of contemporaneous oral declarations,' and expressly rejected the requirement that the declarations be accompanied by a contemporaneous related act." *Id.* at 436 (quoting *Quick v. Michigan Millers Mutual Insurance Co.*, 112 Ill. App. 2d 314, 320 (1969)). The *Munoz* court found *de novo* review of the exclusion to be appropriate because "the trial court based its ruling on relevant documents which it considered in conjunction with the parties' arguments and did not assess the credibility of witnesses. In addition, the trial court based its ruling on an erroneous rule of law." *Id.* at 438-39.

¶ 47 *Munoz* is factually distinguishable from this case. At issue here is not whether the trial court selected the correct law, but whether the court's application of that law to the facts was erroneous. While the trial court considered the notes, emails, and witness statements and did not have a formal hearing, determining the admissibility of the evidence required the trial court to consider all the surrounding facts, including questions regarding reliability and prejudice. Our supreme court has held that the abuse-of-discretion standard of review applies in this circumstance. "The decision whether to admit evidence cannot be made in isolation. The trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice. [Citation.] In this case, the trial court exercised discretion in making these evidentiary rulings, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule." *Caffey*, 205 Ill. 2d at 89-90. Consistent with *Caffey*, we reject defendant's argument that the admission of the hearsay evidence is subject to *de novo* review.

¶ 48                          C. Admissibility of Out-of-Court Statements

¶ 49        Evidentiary rulings, such as granting a motion *in limine*, are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007). An abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 50        The controlling principles governing the admissibility of evidence are also well settled. The court must ask whether the proffered evidence fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable. *Wheeler*, 226 Ill. 2d at 132. "It is entirely within the discretion of the trial court to 'reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature.' " *Id.* (quoting *People v. Harvey*, 211 Ill. 2d 368, 392 (2004)).

¶ 51        Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein and is generally inadmissible. *People v. Banks*, 237 Ill. 2d 154, 180 (2010). However, a statement offered for some reason other than for the truth of the matter asserted is generally admissible because it is not hearsay. *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007). For example, if a statement is offered to prove its effect on the listener's state of mind, or to show why the listener acted as he did, the statement is not hearsay. *Id*. "Hearsay statements offered not for the truth of the matter asserted but to demonstrate motive are similarly admissible when relevant." *People v. Coleman*, 347 Ill. App. 3d 266, 270 (2004).

¶ 52        Statements of the declarant's feelings, plans, or beliefs also are admissible, pursuant to Illinois Rule of Evidence 803(3) (eff. Apr. 26, 2012). Rule 803(3) includes the codification of the state-of-mind exception to the hearsay rule. Rule 803(3)(B) provides that a statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition to prove the state of mind, emotion, sensation, or physical condition of another declarant at that time or at any other time when such state of the other declarant is an issue in the action is excluded by the hearsay rule. In this case, the trial court admitted decedent's statements to coworkers, emails to friends, and handwritten notes to show decedent's state of mind and to show a possible motive for defendant to murder decedent.

¶ 53        Defendant observes that the evidence admitted included a vast and varied amount of out-of-court statements, emails, and notes by decedent that were introduced under the state-of-mind exception. Defendant argues that, in actuality, the evidence was introduced to show the truth of decedent's statements, such as the facts that she and defendant frequently fought and argued with each other and that decedent was ending her relationship with defendant. Defendant maintains that the evidence also was used by the State to show defendant's state of mind as a motive for defendant to murder decedent. Defendant argues that the use of this evidence to show defendant's motive was improper under case law and Rule 803(3)(B). Defendant further contends that the state-of-mind exception was improperly used where decedent's state of mind was not relevant. Defendant also asserts that the trial court failed to consider Illinois law on the state-of-mind exception when it effectively accepted the authority presented by the State's motions *in limine* and failed to consider the seminal cases of *People v. Cloutier*, 178 Ill. 2d 141 (1997), *People v. Lawler*, 142 Ill. 2d 548 (1991), and *People v. Floyd*, 103 Ill. 2d 541 (1984). Defendant contends that the widespread use of decedent's

statements for these improper purposes was so integral to the trial that he was denied a fair trial, requiring that his convictions be reversed.

¶ 54   Case law and Rule 803(3)(B) appear to support defendant's argument that the state-of-mind exception may not be used to show the state of mind of a person other than the declarant. In *Lawler*, the complainant's father testified that he received a call from the complainant, who indicated that she was being held by an armed man. The State used this evidence to show that the defendant was armed and that the complainant could not escape. The supreme court granted a new trial to the defendant, finding that the statements were improperly admitted when the State did not use the statements solely as evidence of the complainant's state of mind. *Lawler*, 142 Ill. 2d at 558-59; see also *People v. Flores*, 168 Ill. App. 3d 636, 637-38 (1988) (decedent's out-of-court statements that a murder defendant had threatened her, accused her of infidelity, and called her employer to see if she was working, improperly used to show truth of statements, such as showing defendant's pre-existing intention to harm decedent if she attempted to obtain a divorce), *rev'd on other grounds by People v. Chevalier*, 131 Ill. 2d 66, 77-79 (1989). In *Cloutier*, the supreme court emphasized that out-of-court statements admitted under the state-of-mind exception may be used to show the state of mind only of the declarant, and not of any other person. *Cloutier*, 178 Ill. 2d at 155; see also *Floyd*, 103 Ill. 2d at 547 ("[u]nder the circumstances, evidence of the statements concerning [the declarant's] fear of harm served no purpose other than to create the inference that the defendant was guilty of murder").

¶ 55   Defendant argues that the cases relied on by the State, such as *People v. Lang*, 106 Ill. App. 3d 808, 814-15 (1982), and *People v. Ross*, 132 Ill. App. 3d 498, 503 (1985), are distinguishable from the case at bar because there the evidence was deemed admissible to rebut the defense or evidence presented by the defendants. Defendant maintains that he presented no evidence at trial and that therefore the out-of-court statements made by decedent were not admissible to rebut any defenses or evidence presented by defendant. We reject defendant's argument specifically as it relates to the handwritten notes.

¶ 56   Our rejection is supported by *Coleman*, in which the court found that a handwritten, dated "to-do" list and out-of-court statements were relevant to demonstrate the wife's state of mind. The additional circumstantial evidence presented at trial was sufficient to establish a basis from which a reasonable jury could infer that the defendant was aware of her plan to obtain a divorce and leave the state, making the disputed evidence relevant to suggest the defendant's motive. *Coleman*, 357 Ill. App. 3d at 271.

¶ 57   In *Coleman*, the defendant disputed the relevance of the State's evidence where the State presented no evidence that the defendant either was present during any of the out-of-court conversations with his wife or was otherwise aware of her intent to divorce him. *Id.* at 270. While the court agreed with the defendant that the State failed to present evidence that he was present for any of the disputed conversations, the record belied his contention that no evidence was presented that he was aware of his wife's plan. *Id.* at 271. Photographs of the crime scene showed that the wife's packed suitcase, her Air Force uniform, and a travel kit containing toiletries were laid out on the living room floor next to the front door, which the defendant used to enter the apartment. The defendant admitted in his written confession that he followed his wife into the hallway leading to the living room. Two cigarette butts containing the defendant's DNA were recovered from an ashtray within arm's reach of the suitcase. The wife's

handwritten, dated "to-do" list, which included the notation "Get a divorce," was recovered from the floor of the bedroom just a few feet from where her body was found. *Id.*

¶ 58 Circumstances similar to those in *Coleman* are present here. The State proved that the notes were written by decedent and that they were in the townhouse prior to the fire. Also, defendant told the police that he was in the townhouse at 11:30 p.m. on January 8 and that decedent arrived at the townhouse about 1:20 a.m. and told defendant that he did not have to move out and then went upstairs to read. Given the layout of the townhouse, defendant would have been in the living room/kitchen area, where the Post-It notes were found. Defendant also told police that, after he left the townhouse, he returned to retrieve a hard hat from the garage, where the other note was found. Neighbors heard defendant and decedent arguing and saw the Jaguar speed away moments before the fire was spotted. Under these circumstances, like those in *Coleman*, the notes found in the townhouse were relevant to demonstrate decedent's state of mind, and the additional circumstantial evidence presented at trial was sufficient to establish a basis from which a reasonable jury could infer that defendant read the notes, making the disputed evidence relevant to suggest defendant's motive. Thus, the contents of the handwritten notes were not hearsay, as they were not offered for the truth of the matter asserted, but were admitted for the effect that they had on defendant. Accordingly, to that extent, the trial court's admonishments to the jury regarding the out-of-court statements were not erroneous, and we find that the trial court did not abuse its discretion by admitting them.

¶ 59 To the extent that the other out-of-court statements were erroneously admitted, we find them harmless in light of the totality of the other evidence admitted at trial. In this case, decedent's mother testified that decedent appeared at her house in the early morning hours, the Sunday before the fire. She was crying and appeared upset. Decedent spent the day there, slept there, and went to work from there on Monday despite the fact that decedent's home was only about a mile away. Defendant's employer testified that, the weekend prior to the fire, defendant had told him that he was having trouble with his girlfriend and had to move. Neighbors heard defendant and decedent arguing about a half hour before the Jaguar sped away from the townhouse, within minutes of when the fire was spotted. It was determined that gasoline was used as an accelerant, and the police found an empty gas can, without a cap, in the trunk of the Jaguar defendant drove. Defendant's statements regarding the times he left the townhouse and met a coworker were disputed by witnesses and technological evidence. Additionally, as stated, the jury could draw a reasonable inference from the presence of the handwritten notes in the townhouse that defendant was aware of decedent's intent to break up with him and to order him to move out of the townhouse before the argument began.

¶ 60                                    D. Ineffective Assistance

¶ 61 We last examine defendant's ineffective-assistance argument. Defendant claims that trial counsel was ineffective for failing to request separate verdicts on the State's three theories of first-degree murder–intentional murder, knowing murder, and felony murder. Defendant believes that, if the jury had convicted him of felony murder, based on the predicate felony of aggravated arson, his separate conviction of aggravated arson "would have been vacated under [the] one-act, one-crime [rule]."

¶ 62 Both the United States and Illinois Constitutions guarantee a defendant the right to effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The purpose of this guarantee is to ensure that the defendant receives a fair trial. *Strickland v.*

*Washington*, 466 U.S. 668, 684-85 (1984). The ultimate focus of the inquiry is on the fundamental fairness of the challenged proceedings. *Id.* at 696. There is, however, a strong presumption of outcome reliability, so to prevail a defendant must show that counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

¶ 63    Under *Strickland*, defense counsel is ineffective only if (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's error prejudiced the defendant. Failure to establish either prong defeats the claim. *Id.* at 687.

¶ 64    Defendant cites *People v. Smith*, 233 Ill. 2d 1 (2009), for the proposition that, where intentional murder and felony murder are consolidated into one general verdict and the defendant is subject to a consecutive sentence on the felony underlying felony murder, the conviction and sentence for the underlying felony must be vacated. In *Smith*, the defendants were charged under three theories of liability for first-degree murder–intentional murder, knowing murder, and felony murder. The supreme court reiterated that the three theories embodied in the first-degree murder statute reflect "merely different ways to commit the same crime." (Internal quotation marks omitted.) *Id.* at 16. While a general verdict need not rest on a unanimous finding of a particular theory of murder, the court recognized, there may be different sentencing consequences based on the specific theory of murder proven. *Id.* at 16-17. Under the "one good count rule," when a defendant is charged with murder in multiple counts alleging intentional, knowing, and felony murder, and where a general verdict of guilty is returned, the defendant is presumed to be convicted of the most serious offense–intentional murder. In that case, the court noted, the judgment and sentence should be entered on the intentional murder conviction, as this would permit the defendant also to be convicted and sentenced on the felony underlying the felony murder charge. The court further recognized that the sentence on the felony underlying the felony murder charge must be served consecutively to the intentional murder sentence. *Id.* at 17-18.

¶ 65    However, the court stated that, where specific verdict forms are given and a defendant is acquitted of intentional murder and knowing murder, and convicted only of felony murder, the defendant may not be convicted on the underlying felony. In such instances, the predicate offense will not support a separate conviction or sentence. *Id.* at 17 (citing *People v. Smith*, 183 Ill. 2d 425 (1998)).

¶ 66    In *Smith*, both defendants had requested, but the trial courts had refused, to give specific verdict forms, and the respective juries returned general verdicts of guilty. The supreme court found that the trial courts had abused their discretion by denying the requested specific verdict forms for the separate theories of murder and deprived the defendants of the opportunity to obtain a ruling on their theory that they were guilty only of felony murder. *Id.* at 23. Under these circumstances, the court refused to apply the "one good count rule" and interpreted the general verdict as a finding on felony murder. *Id.* at 28. Accordingly, the court vacated the convictions of the felonies underlying the felony murder convictions. *Id.* at 29.

¶ 67    Applying the analysis and ruling in *Smith* to the present case, defendant contends that trial counsel's failure to object to the general verdict forms on the murder charges and his failure to request specific verdict forms deprived defendant of the opportunity to require the jury to unanimously find him guilty of either intentional or knowing murder before he could be sentenced consecutively on the conviction of aggravated arson.

¶ 68      The State argues that the evidence can support separate convictions of felony murder and the underlying felony of aggravated arson because decedent was specified in the felony murder charge but not in the aggravated arson charge. The State proffers that, based on the nature of the structure, being a townhouse, it was reasonable for defendant to be aware that, in addition to decedent, others were present in the building. The difficulty with this theory is that it appears to violate the holding in *People v. Crespo*, 203 Ill. 2d 335, 342-45 (2001), wherein the supreme court held that the State must sufficiently differentiate between the acts in the charging document if it wishes to seek convictions for separate acts. In the present case, the aggravated arson indictment specifically identified decedent's unit and the State did not offer a different theory at trial.

¶ 69      The State, however, makes a compelling argument regarding the deficient-performance prong of *Strickland*. The State asserts that defendant has not overcome the presumption that his counsel's decision not to offer specific verdict forms was sound trial strategy. Indeed, a defendant must overcome a strong presumption that, under the circumstances, the challenged action or inaction of counsel was a valid trial strategy. *People v. Bloomingburg*, 346 Ill. App. 3d 308, 317 (2004). The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts. *People v. Kelley*, 304 Ill. App. 3d 628, 634 (1999). Because effective assistance refers to competent and not perfect representation (*People v. Odle*, 151 Ill. 2d 168, 173 (1992)), mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent (*People v. Palmer*, 162 Ill. 2d 465, 476 (1994)).

¶ 70      First, we note that the holding in *Smith* has been limited by the supreme court to situations where the trial court has refused defense counsel's request for a separate felony murder verdict form. *People v. Davis*, 233 Ill. 2d 244, 273 (2009). Second, the First District Appellate Court in *People v. Calhoun*, 404 Ill. App. 3d 362, 383-84 (2010), recognized this limited holding, determining that *Smith* does not form the basis for an ineffective-assistance claim. See also *People v. Mabry*, 398 Ill. App. 3d 745, 755-56 (2010); *People v. Braboy*, 393 Ill. App. 3d 100, 108 (2009). Specifically, the First District determined that this argument does not overcome the presumption of sound trial tactics. *Calhoun*, 404 Ill. App. 3d at 383-84; see also *Braboy*, 393 Ill. App. 3d at 108.

¶ 71      Here, since defendant's theory at trial appeared to be that he did not commit the offense, and not that he committed certain acts but did not commit intentional or knowing murder, the decision not to separate felony murder from the other offenses was presumably a tactical decision. Consequently, we find that defense counsel's decision to proceed with a general verdict form could very well have been the product of sensible trial strategy.

¶ 72      Because defendant has failed to make the requisite showing of counsel's deficient performance under the first prong of the *Strickland* analysis, we need not proceed to the prejudice prong. See *Strickland*, 466 U.S. at 687 (noting that the failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim). We also need not address defendant's argument that his multiple convictions violate the one-act, one-crime rule under *Crespo*, 203 Ill. 2d at 342-45.

¶ 73                              III. CONCLUSION

¶ 74        For the reasons stated, we affirm defendant's first-degree murder and aggravated arson convictions.

¶ 75        Affirmed.