# Illinois Official Reports

## Appellate Court

---

### *People v. Thomas*, 2020 IL App (1st) 170310

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHANTE THOMAS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-17-0310 |
| Filed<br>Modified upon<br>denial of rehearing | December 1, 2020<br><br>December 15, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-08111-02; the Hon. Brian K. Flaherty, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Marsha Watt, Assistant Public Defender, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, Tasha-Marie Kelly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |

Panel                     JUSTICE LAVIN delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1       Following simultaneous but severed jury trials, defendant Shante Thomas and her boyfriend, codefendant Deandre Minkens, were found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) of Rosemary Newman (the victim) and intentional homicide of her unborn child (*id.* § 9-1.2(a)(1)).[1] Defendant was sentenced to natural life in prison.

¶ 2       In this direct appeal, defendant challenges the trial court's denial of her pretrial motions to quash arrest and suppress incriminating statements made at the police station and to admit evidence of codefendant's violent nature. Defendant also challenges the trial court's refusal to give non-Illinois Pattern Jury Instructions (IPI) on obstruction of justice, even though she was not charged with that offense in the indictment and conceded that it was not a lesser included offense of those for which she was charged. Last, defendant challenges her murder conviction based on the sufficiency of the evidence and her discretionary life sentence as unconstitutionally excessive. Finding no merit in defendant's arguments, we affirm.

¶ 3                             BACKGROUND

¶ 4       Defendant was 19 years old when she accompanied codefendant to the police station after he was arrested for first degree murder of the victim and intentional homicide of her unborn child on April 25, 2011. Defendant left the station later that night but returned the following day. Meanwhile, the police learned that defendant had misled them in their investigation of the victim's murder.

¶ 5       Defendant was initially arrested for obstruction of justice on April 26, 2011. Thereafter, defendant confessed that she was involved in the victim's murder and was then charged with the above-stated offenses (see *supra* ¶ 1).

¶ 6       Prior to trial, defendant filed several motions to quash arrest and suppress evidence, arguing, in the main, that she was in custody without probable cause beginning on April 25, 2011, when codefendant was arrested; thus, her subsequent confession was inadmissible as fruit of the poisonous tree. In response, the State argued that defendant voluntarily chose to accompany codefendant to the police station where she was treated as a witness, not a suspect, and that she voluntarily returned the following day.

¶ 7       Evidence at the hearings on defendant's motions generally showed that around 3:30 p.m. on April 25, 2011, defendant was with codefendant near her home when he was arrested for the murder. The police asked defendant if she wanted to accompany codefendant to the police station. She said yes and was given a ride by the police. Unlike codefendant, however, defendant was not handcuffed when the police drove her in a separate vehicle from him that

---

[1]Codefendant is not a party to this appeal. We note, however, that codefendant's convictions were affirmed by this court in *People v. Minkens*, 2020 IL App (1st) 172808.

did not contain a barrier between the front and back seats. Defendant was also allowed to keep her personal belongings, including her cell phone.

¶ 8    At the station, defendant told the police that she had been with codefendant and their friend, Joshua Miller, the night the victim was murdered. Because defendant was not considered a suspect at that time, her statements were not recorded. The police drove defendant home later that night. Meanwhile, the police learned that Miller had not been with defendant or codefendant the night in question but, instead, had been asked to provide an alibi by codefendant prior to his arrest and then again by defendant after she left the police station that night.

¶ 9    The next evening, on April 26, 2011, defendant returned to the station with her mother, Mia Fox. The police told defendant what Miller had said but she nevertheless maintained her initial story. Still, she refused to take a polygraph test, asking for an attorney instead.

¶ 10   We note that defendant's mother called an attorney, Raymond Kennan, on April 27, 2011. Kennan's testimony, however, established that he never represented defendant even though he spoke to one of the detectives about the investigation while she was at the police station.[2]

¶ 11   In any event, the police stopped all questioning after defendant asked for an attorney. Subsequently, defendant was arrested for obstruction of justice. She then asked to speak to one of the detectives. Defendant was informed of her *Miranda* rights but waived them and agreed to take a polygraph test. We note, however, that after defendant was arrested for obstruction of justice, all ensuing conversations with the police were electronically recorded, also known as electronic recording of interrogations.

¶ 12   Defendant again waived her *Miranda* rights before taking the polygraph test the next morning. During the test, she was given food and a blanket and allowed to use the bathroom. The results of defendant's polygraph test were consistent with her having provided false information to the police about her whereabouts the night the victim was murdered. After defendant was informed of the test results, she spoke to her mother and then asked to speak to one of the detectives. She continued to change her story as to the events that occurred on the night in question but eventually confessed that she was in codefendant's car when the victim was murdered and then went to the forest preserve with him to dump her body.

¶ 13   Ultimately, the trial court denied defendant's motions to quash arrest and suppress her statements made at the police station, including her confession. In reaching its decision, the court concluded that defendant voluntarily went to the police station when codefendant was arrested and that there was probable cause to arrest her for obstruction of justice the following day. The court further concluded that suppression was not warranted because defendant's statements were made voluntarily either before she was in custody or after she had been Mirandized.

¶ 14   The trial court also denied defendant's pretrial motions to admit evidence related to codefendant's violent nature, including past crimes and out-of-court statements made by the victim to her friend.

¶ 15   The cause proceeded to trial where the following evidence, consisting of many of the facts already presented at the suppression hearings, was adduced. In the summer of 2010, defendant

---

[2]Notably, Kennan did not ask whether defendant had been Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) when the detective informed him that she was being charged with murder.

was in a relationship with codefendant when he began seeing the victim, who later became pregnant, presumably with his child. When defendant learned of the situation, she was incensed and, consequently, began threatening the victim, leading her to file police reports against defendant. Testimony of the victim's close friend, Nailah Washington, also revealed that defendant had threatened the victim on multiple occasions. On one of those occasions, defendant called the victim, letting her know that she was "fucking with the [wrong] family."

¶ 16    Around 10 p.m. on April 23, 2011, the victim, then nine months pregnant, was living with her mother, Rosie Newman (Newman), when she left to meet codefendant. He picked her up and drove them to an Applebee's restaurant less than two miles away, located at 4937 Cal Sag Road in Crestwood, Illinois. After they arrived, the victim called her mother, letting her know they made it to the restaurant safely and that she would be home soon.[3] But the victim never made it home.

¶ 17    The next morning, on Easter Sunday, codefendant called Newman, asking to speak to the victim. He claimed to have been with defendant the night before, not with the victim. Newman immediately called the police to file a missing person's report. A short time later, Alsip police officers Joshua Spencer and Hector Puente arrived at Newman's apartment where she explained to them the above-stated events. She gave them codefendant's phone number but their calls to him went unanswered. Newman also described her daughter the last time she ever saw her, stating she was wearing a green T-shirt and black pants and had red-tinted hair that was tightly braided.

¶ 18    When the officers entered the victim's information in the police database, they discovered her previous reports of being threatened by defendant, as mentioned above (*supra* ¶ 15). Meanwhile, a body was found matching the victim's description less than three blocks away from codefendant's home, in a Calumet City forest preserve.

¶ 19    Testimony from the detectives who were called to assist with the investigation of the body that was found, and later identified as the victim, indicated they found her lying facedown wearing only a "green T-shirt, underwear and ankle socks." Additionally, the detectives observed injuries to the victim's mouth, nose, neck, and back, as well as petechial hemorrhaging in her eyes, indicating manual strangulation. The victim's autopsy confirmed those observations, revealing that she suffered blunt force trauma to the head and died from strangulation.

¶ 20    Later that afternoon, codefendant returned Officer Spencer's call, claiming that he had not seen the victim in several days even though two Applebee's employees confirmed that he had been with her at the restaurant the night before. Nevertheless, codefendant claimed that he had been at a night club known as "The Lick" in Harvey, Illinois, but surveillance video showed him and defendant more than 30 miles away from that club at a gas station near defendant's home. They were in a white four-door Saturn that the officers had learned belonged to codefendant.

¶ 21    The State introduced forensic evidence of the victim's fingernail clippings, containing "blood-like stains," recovered from codefendant's car, as well as DNA evidence showing that blood found in the car matched defendant's, codefendant's, and the victim's profiles. The State also introduced the electronic recordings of defendant's interrogations, admitting that she was

_____
[3]The victim made the call on Newman's cellphone which she regularly used because she did not have her own.

- 4 -

in codefendant's car when the victim was murdered and then at the forest preserve where her body was found.

¶ 22 Defendant's confession was consistent with the testimony of codefendant's cellmate, a jailhouse informant. That testimony largely reflected that, on the night in question, codefendant took the victim to Applebee's while defendant hid in the trunk of his car, which had an access panel to the backseat. At some point after they got back in the car, codefendant turned up the radio volume, signaling defendant, who then lunged through the access panel and strangled the victim while he punched her in the stomach. After the victim stopped breathing, they dumped her body in the forest preserve and went to defendant's home.

¶ 23 The jury found defendant guilty of first degree murder of the victim and intentional homicide of her unborn child. The trial court then sentenced defendant to natural life in prison.

¶ 24 Defendant filed a motion to reconsider her sentence, asserting that the trial court misconstrued the sentencing statute as to the unborn child's death and unfairly imposed the same sentence that codefendant, a repeat violent offender, received. In rejecting those arguments, the trial court underscored defendant's evil actions in committing the offenses, stating:

> "To say that this was a horrific crime *** would be an understatement. And [defendant] was not simply some passive participant in this crime. She was active in the planning. From the testimony it came out that she was active in the execution of this senseless killing of this young woman. Again, she was not just sitting by, watching. She was actively participating in the murder of this young woman."

The trial court denied defendant's motion on May 3, 2017.[4]

¶ 25 This appeal followed.

¶ 26                                          ANALYSIS

¶ 27 Defendant first contends that the trial court erroneously denied her pretrial motions to quash arrest and suppress evidence because she was in custody beginning on April 25, 2011, before the police acquired probable cause when she confessed that she was involved in the victim's murder. In response, the State maintains that defendant was not in custody until she was arrested for obstruction of justice on April 26, 2011, after which she waived her *Miranda* rights and confessed.

¶ 28 Before proceeding to the merits, however, we note that both parties have failed to provide proper citation to the record or authorities relied upon in the statement of facts and argument sections of their briefs, in violation of Illinois Supreme Court Rule 341(h)(5), (h)(7), (i) (eff. Oct. 1, 2020). And where citations are provided, they are either erroneous or do not correspond with the preceding statement or argument. See *id.* This court is not a repository into which the parties may foist the burden of argument and research. *People v. Jacobs*, 405 Ill. App. 3d 210, 218 (2010). Furthermore, it is neither our function nor obligation to act as an advocate of either party or to search the record for error. *Id.* Even though we will proceed to consider the merits of defendant's appeal, we strongly advise both parties to refrain from such noncompliance going forward.

---

[4]The trial court also denied defendant's *pro se* motion to reduce her sentence.

¶ 29     When reviewing a trial court's rulings on motions to quash arrest and suppress evidence, where mixed questions of fact and law are presented, we apply a two-part standard of review. *People v. Soto*, 2017 IL App (1st) 140893, ¶ 48; *People v. Payne*, 393 Ill. App. 3d 175, 179-80 (2009). We will not reverse the trial court's findings of fact unless they are against the manifest weight of the evidence, *i.e.*, only when the opposite conclusion is clearly evident. *Soto*, 2017 IL App (1st) 140893, ¶ 48. In contrast, we review the trial court's legal ruling as to whether suppression was warranted *de novo*. *Id.* In doing so, we may consider trial evidence, as well as evidence presented at the hearings on the motions to quash arrest and suppress evidence. *Id.*

¶ 30     The first issue before us is whether defendant was, in fact, in custody before she confessed. A person is in custody when her freedom of movement has been restrained or when a reasonable person under the same circumstances would not have felt free to leave. *People v. Slater*, 228 Ill. 2d 137, 150 (2008); *People v. Melock*, 149 Ill. 2d 423, 436 (1992).

¶ 31     Here, defendant was not in custody until she was arrested for obstruction of justice on April 26, 2011. As set forth above, defendant voluntarily chose to accompany codefendant to the police station the day before. She was neither handcuffed nor denied access to her personal belongings, including her cellphone, and was driven in a separate police vehicle from codefendant that did not have a barrier between the front and back seats. Additionally, defendant left the police station later that night and was even given a ride home. Defendant then voluntarily agreed to return to the station the next day with her mother. Under those circumstances, we cannot say that defendant's freedom of movement had been restrained or that a reasonable person would not have felt free to leave.

¶ 32     Moreover, it is important to note that, when the police arrested codefendant, they were aware that defendant had threatened the victim in the past (see *supra* ¶¶ 15, 18) but still did not question her about it. This suggests that defendant was not considered a suspect or in custody on April 25, 2011.[5] Accordingly, we conclude that defendant was not in custody before she confessed.

¶ 33     Next, we must determine whether defendant's confession in this case was voluntary. The fifth amendment and the Illinois Constitution of 1970 (U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10) protect an individual's right against self-incrimination in custodial interrogations by requiring that a defendant be informed of her rights to remain silent and to an attorney and that any statement given may be used against her in court. *People v. Dennis*, 373 Ill. App. 3d 30, 42 (2007) (citing *Miranda v. Arizona*, 384 U.S. 436, 475-77 (1966)). A defendant waives her *Miranda* rights, however, where the decision to relinquish those rights was voluntary, *i.e.*, it was not the result of intimidation, coercion, or deception and where it was made with full awareness of the nature of the rights being abandoned and the consequences thereof. *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009).

¶ 34     Here, defendant was informed of her *Miranda* rights when she was arrested for obstruction of justice and again before she was given the polygraph test. In both instances, defendant made

---

[5]We note that, because defendant was not in custody on April 25, 2011, her nonrecorded statements made at the police station that day were admissible at trial. But *cf.* 725 ILCS 5/103-2.1(b)(1) (West 2012) (stating that "[a]n oral, written or sign language statement of an accused made as a result of a custodial interrogation conducted at a police station *** shall be presumed to be inadmissible as evidence against the accused" unless "an electronic recording is made of the custodial interrogation").

a conscious, voluntary decision to waive those rights under no threat of intimidation, coercion, or deception. To the contrary, defendant was fully informed of the murder investigation, including Miller's statements to the police that belied her own. She was allowed to see her mother and use the bathroom upon request and was given food, soda, and a blanket. Furthermore, the record suggests that defendant was aware of the nature of the rights she was waiving and the consequences thereof because she asked for an attorney before she was in custody; thus, defendant had some understanding of *Miranda* rights before she was informed of them (see *supra* ¶ 9). Yet, she chose to waive those rights on two separate occasions on different days. Thus, we conclude that defendant's confession in this case was voluntary.

¶ 35    Based on the foregoing, we cannot say the trial court's findings that defendant was not in custody before she confessed and that her confession was voluntary were against the manifest weight of the evidence or that suppression of her confession was warranted. Accordingly, the trial court properly denied defendant's pretrial motions to quash arrest and suppress evidence.

¶ 36    We also conclude that the trial court did not abuse its discretion in denying defendant's pretrial motions to admit evidence of codefendant's past crimes and out-of-court statements made by the victim to her friend. See *People v. Lopez*, 2014 IL App (1st) 102938-B, ¶ 22 (stating that evidentiary rulings rest within the sound discretion of the trial court whose determinations will not be reversed on appeal absent a clear abuse of discretion).

¶ 37    Where, as here, a defendant seeks to admit evidence of prior crimes that she was not involved in, admissibility is judged under ordinary principles of relevance. See *id*; *People v. Pikes*, 2013 IL 115171, ¶ 20 (where the prior or collateral crimes were not committed by the defendant, the admissibility of that evidence is judged under ordinary relevancy principles rather than traditional other-crimes analysis). In this regard, proffered evidence is admissible if it tends to prove or disprove the offenses charged, and that evidence is relevant only if it tends to make the question of guilt more or less probable. *People v. Hill*, 2014 IL App (2d) 120506, ¶ 50.

¶ 38    In this case, defendant sought to admit evidence of codefendant's past crimes involving domestic violence, including a conviction for first degree cruelty to children. Defendant, however, has not shown, or argued, that evidence was relevant to her defense by establishing that it either disproved the offenses charged against her or called her guilt into question. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on").

¶ 39    To the extent defendant asserts that codefendant's past crimes were admissible under section 7.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4 (West 2014)), this applies only to evidence in domestic violence cases "in which the *defendant* is accused of an offense of domestic violence." (Emphasis added.) *Id.* § 115-7.4(a). Because defendant was not accused of the domestic-related offenses committed by codefendant, that evidence was not admissible. And, while that evidence may have shown codefendant's propensity for violence, it had no bearing on whether defendant was guilty in this case because she never claimed in her pretrial motions or at trial to have been a victim of his violence or to have been acting in self-defense.[6] *Cf. People v. Lynch*, 104 Ill. 2d 194, 200-01 (1984) (holding

---

[6]According to her presentence investigation report, defendant told the investigating officer, Jayne Mulcrone, that "she was physically and verbally abused by *** co-defendant." Additionally,

that the victim's aggressive and violent character was relevant to show who was the aggressor where the victim raised the theory of self-defense). In fact, defendant expressly stated in her motion to admit codefendant's past crimes that she "in no way asserts a claim of self defense." We therefore conclude that codefendant's past crimes were not admissible in this case.

¶ 40     For the same reasons, the victim's prior out-of-court statements made to her friend regarding codefendant's violent temper were not relevant as to whether defendant had committed the charged offenses in this case or whether she was guilty. Regardless, the victim's statements were inadmissible hearsay that did not constitute dying declarations subject to exception under Illinois Rule of Evidence 804(b)(2) (eff. Jan. 1, 2011) because they were made several weeks before she was murdered. The victim's statements, therefore, could not have pertained to either the cause or circumstances of her murder. See Ill. R. Evid. 804(b)(2) (eff. Jan. 1, 2011); see also *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 57 (noting that statements cannot be admitted as dying declarations unless they were made under the belief of impending death and relate to the cause or circumstances of the underlying homicide).

¶ 41     Likewise, the victim's hearsay statements were not admissible under section 115-10.2a of the Code (725 ILCS 5/115-10.2a(a) (West 2014)) because the victim in this case was not abused by a family or household member. See *id.* § 115-10.2a(a) (applying only to statements made "by an individual identified in [s]ection 201 of the Illinois Domestic Violence Act of 1986 as a person protected by that Act"); see also 750 ILCS 60/201(a)(i) (West 2014) (identifying only individuals and minors who are "abused by a family or household member"). Accordingly, the trial court properly denied defendant's motions to admit codefendant's past crimes and the victim's prior out-of-court statements.

¶ 42     The trial court also did not abuse its discretion in refusing to give non-IPI jury instructions on obstruction of justice when defendant was not ultimately charged with that offense and conceded that it was not a lesser included offense of the charged offenses. See *People v. Davis*, 213 Ill. 2d 459, 475 (2004) (reviewing a trial court's decision declining to give a tendered jury instruction for an abuse of discretion). A defendant is not entitled to have the jury instructed on an offense for which she was not charged that is not a lesser included offense of the charged offenses. See *People v. Ceja*, 204 Ill. 2d 332, 359 (2003).

¶ 43     In this case, defendant was charged with multiple counts of first degree murder and intentional homicide of an unborn child. Although defendant was initially arrested for obstruction of justice, the indictment did not charge her with that offense and made no reference to that theory of liability, presumably since she confessed her involvement in the victim's murder. Moreover, defense counsel conceded that obstruction of justice was not a lesser included offense of those charged in this case when he requested the instruction at trial: "I understand it is not a lesser included [offense] of any of the charges that remain." Thus, we cannot say that the trial court abused its discretion when it refused to instruct the jury on obstruction of justice.

¶ 44     Turning to defendant's challenge to her murder conviction based on the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112,

_____

defendant's *pro se* motion for a reduction of sentence alleged that she "was forced to participate in the crime" and that her "life was at risk," but it made no mention of codefendant.

¶ 64. We will not overturn a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.* Furthermore, the trier of fact is in the best position to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences therefrom; thus, we will not substitute the trier of fact's credibility assessments with our own. *Id.*

¶ 45    A person is guilty of the offense of first degree murder when she kills an individual without lawful justification if, in performing the acts which cause the death, she intends to kill or do great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 46    The record in this case shows that the evidence at trial overwhelmingly supported the jury's finding of guilt. Most notably, defendant confessed that she was involved in the victim's murder. Her confession was supported by forensic and DNA evidence, as well as testimony that not only belied her initial story to the police but also described the events that led to victim's murder in codefendant's car where she was hiding in the trunk. Given that evidence, the jury in this case certainly could have found that defendant intended to kill the victim and was successful. Accordingly, we conclude that the evidence in this case was sufficient to sustain defendant's murder conviction.

¶ 47    Last, defendant challenges her discretionary natural life sentence as unconstitutionally excessive. Defendant claims that new scientific evidence concerning brain development in youths and the reasoning set forth in a line of caselaw beginning with the United States Supreme Court decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which prohibits mandatory life sentences for juveniles who commit murder, should be considered and applied to her specific circumstances as a 19-year-old young adult with no prior convictions.

¶ 48    The State argues, and we agree, that defendant forfeited her as-applied constitutional challenge by not raising it in the trial court. As a result, she has failed to develop an evidentiary record for her claim in the court below, precluding our review. See *People v. Harris*, 2018 IL 121932, ¶ 39 (reemphasizing that "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court").

¶ 49    On the merits, the State maintains that defendant has not shown that, as-applied to her circumstances, a discretionary life sentence is unconstitutionally excessive because *Miller* applied only to juvenile offenders and involved constitutional attacks on mandatory life sentences, not discretionary. But *cf. Miller*, 567 U.S. at 489 (holding that mandatory life sentences without the possibility of parole for juvenile offenders violate the eighth amendment's ban on cruel and unusual punishment); *People v. Buffer*, 2019 IL 122327, ¶ 42 (holding that the juvenile offender's mandated 40-year sentence was a *de facto* life sentence in violation of the eighth amendment); *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 22 (similar); but see *People v. Holman*, 2017 IL 120655, ¶¶ 47-50 (holding that the juvenile offender's discretionary life sentence did not violate the eighth amendment where the sentencing court considered his youth and its attendant characteristics at the time of sentencing).

¶ 50    Here, defendant did not raise her as-applied constitutional challenge in the trial court. Instead, she argued in her motion to reconsider that the trial court misapplied the sentencing statute in imposing a discretionary life sentence because she was not found guilty of murdering more than one victim since the unborn child's death was defined as a "homicide." But *cf.* 730

ILCS 5/5-8-1(1)(c)(ii) (West 2016) (mandating a term of natural life imprisonment when the defendant is not a juvenile and "is found guilty of murdering more than one victim").

¶ 51      To the extent defendant argued in her motion to reconsider that her life sentence was "inappropriate for the same reasons" set forth in *Miller*, this was at best an implied facial challenge to mandatory life sentences for youths even though defendant's sentence in this case was discretionary.[7] But see *People v. Lusby*, 2020 IL 124046, ¶ 33 (addressing *Miller*, the court stated that "[t]he constitutional flaw with mandatory life sentences is their mandatoriness" but emphasized that *Miller* "did not foreclosure the possibility of discretionary life sentences for juveniles"). In concluding that defendant's as-applied challenge is premature, we note that her reply and supplemental briefs are devoid of any response to the State's forfeiture argument.

¶ 52      We further note that defendant impermissibly claimed, for the first time in her petition for rehearing, that her life sentence amounted to an abuse of discretion for the same reasons mentioned above (see *supra* ¶ 47). See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that "[p]oints not argued are forfeited and shall not be raised *** on petition for rehearing"). Regardless, defendant's claim raised an as-applied constitutional challenge, which is reviewed *de novo*, that she forfeited. See *People v. Vega*, 2018 IL App (1st) 160619, ¶ 52 ("An as-applied constitutional challenge is a legal question that we review *de novo*.").

¶ 53      Accordingly, we decline to remand this matter for an evidentiary hearing.

¶ 54                         CONCLUSION

¶ 55      Based on the foregoing, we affirm the judgment of the trial court.

¶ 56      Affirmed.

---

[7]See, *e.g.*, *Harris*, 2018 IL 121932, ¶ 38 (stating that a "party raising a facial challenge must establish that the statute is unconstitutional under any possible set of facts").